CHAPMAN CHEMICAL COMPANY *v.* TAYLOR, ET AL.

4-8844

Opinion delivered June 27, 1949.

Rehearing denied October 3, 1949.

*Evans, Exby & Moriarty* and *Coleman, Gantt & Ramsay,* for appellant.

*A. F. Triplett, Bridges, Bridges, Young & Gregory* and *John Harris Jones,* for appellee.

Frank G. Smith, J.   Mrs. Virginia C. Wilson owns a farm in Jefferson County, which she rented in the year 1947 to G. E. Taylor for an agreed share of the crops grown on the land, the principal crop being cotton.   She and her tenant filed this suit against Elms Planting Co., a corporation, to recover damages to their crop occasioned by the use of a chemical dust by the Elms Co. called 2-4-D, in spraying a rice crop on land owned by the Elms Co. which was three-fourths of a mile from plaintiffs' crop.

The testimony shows that within very recent years there has been developed a powerful chemical referred to as 2-4-D, which is very damaging to any broad leaved plant with which it has contact, but which does no harm to grasses and plants which are not broad leaved. The Elms Co. used this chemical in spraying its rice crop and particles thereof drifted and settled on plaintiffs' cotton crop, greatly reducing the yield thereof and this suit was brought to recover compensation for this damage.

The Elms Co. filed an answer in which liability was denied. In addition it filed a cross-complaint against Chapman Chemical Co. and others who have passed out of the case. Service on the Chemical Co., an Illinois corporation, was had under the provisions of Act 347 of the Acts of 1947, which were fully complied with. It was alleged in its answer that if the Elms Co. was in fact liable in any amount, the Chemical Co:, if not primarily and solely liable, was at least a joint tortfeasor and the provisions of Act 315 of the Acts of the General Assembly of 1941, known as the Uniform Contribution Among Tortfeasors Act were invoked.

The Chemical Co. was not made a party defendant to the original suit of the plaintiffs who filed a motion praying that the suit against the Chemical Co. be dismissed. This motion was overruled.

Numerous other pleadings were filed. The Chemical Co. appeared for the purpose only of moving to quash the service against it. The testimony on the hearing of this motion will be later discussed. The motion was overruled and exceptions saved. The Chemical Co. moved to dismiss also upon the ground that Act 315, supra, has no application inasmuch as there is no liability on the part of the Chemical Co. to the plaintiffs. This motion, which will later be discussed was also overruled. The case proceeded to a trial where numerous exceptions were saved to various actions and rulings of the court and resulted in a verdict in favor of the plaintiffs against the Chemical Co. and in favor of the Elms Co. From the judgments rendered upon this verdict the Chemical Co. has appealed and so also have the plaintiffs.

The first question properly to be considered is that of the sufficiency of the service on the Chemical Co. which, as we have said, was had under the provisions of Act 347 of the Acts of 1947, the relevant provisions of which are as follows:

"Section 2. Any non-resident person, firm, partnership, general or limited, or any corporation not qualified under the Constitution and Laws of this State as to doing business herein, who shall do any business or perform any character of work or service in this State shall, by the doing of such business or the performing of such work, or service, be deemed to have appointed the Secretary of State, or his successor or successors in office, to be the true and lawful attorney or agent of such non-resident, upon whom process may be served in any action accrued or accruing from the doing of such business, or the performing of such work, or service, or as an incident thereto by any such non-resident, or his, its or their agent, servant or employee. Service of such process shall be made by serving a copy of the process on the said Secretary of State, and such service shall be sufficient service upon the said non-resident of the State of Arkansas, provided that notice of such service and a copy of the process are forthwith sent by registered mail by the plaintiff, or his attorney, to the defendant at his last known address, and the defendant's written return receipt, or the affidavit of the plaintiff, or his attorney, of compliance herewith are appended to the writ of process and entered in the office of the Clerk of the court wherein said cause is brought. The court in which the action is pending may order such continuance as may be necessary to afford the defendant, or defendants, reasonable opportunity to defend the action."

This act was upheld as valid legislation in the case of Gillioz v. Kincannon, Judge, 213 Ark. 1010, 214 S. W. 2d, 212, except the retroactive feature thereof. Here all relevant facts accrued after the act was in full force and effect. The insistence is, however, that the Chemical Co. has done no business in this State sufficient to bring it

within the provisions of the act. Upon this issue of fact the following testimony was offered.

There are three separate corporations, each doing business as the Chapman Chemical Co. One of these is located in the State of Louisiana, another in the State of Illinois, and the third in the State of Tennessee. The Tennessee corporation is engaged in manufacturing chemicals solely for sale by the Illinois Co. and the Louisiana Co. All the stock in all three corporations is owned by Dale Chapman except a single share in each, which is otherwise owned for qualifying purposes. Orders are sent to and filled by the Illinois corporation, the only one of the three companies here sued. The Illinois corporation has no office or warehouse in this state, has no bank account here, and has no agent in this State. Orders for the products of the Tennessee corporation are received in Illinois and filled from that state from the Tennessee office by shipments in interstate commerce at the direction of the Illinois company, which has the exclusive power to receive and fill orders. In this connection it may be said that no attempt was made to show that the Illinois corporation was doing business in the sense that it would be subject to penalties for failure to secure authorization from the state for admittance to the state.

It was shown, however, that for the 12 or 15 years last past, the Illinois company had sold throughout the State certain wood preservatives. Sales made in Arkansas comprised a substantial part of the company's business and its traveling salesmen had for many years operated in this State. Its principal customers were operators of lumber mills and wholesale lumber dealers, who act as distributors for the wood preservatives. Representatives of the Chemical Co. consulted and advised with the agricultural and forestry agents of this State as to the manner in which the products it was selling should be used, and as to additional uses thereof which might be made, and in otherwise building up a good will valuable to its business.

Specifically as to the use of 2-4-D the testimony is to the effect that the Chemical Co. sought to introduce its use in the rice growing area of the State, and to that end its representatives came into the State and conferred with officers of the Rice Growers Assn. as to its use. It was agreed that a test should be made and one was made in this State, the purpose of which was to determine whether the 2-4-D dust could be distributed from an airplane, as could other chemical dusts of various kinds for various purposes by farmers. The test was made and it was shown that it could be so used. Chapman, the Company's president, testified that he knew it could be so used before the test was made, but the purpose of the test was to demonstrate that fact to prospective customers. No test was made as to the floating quality of the dust, that is the distance it would carry in the air after it was released from a plane.

Chapman brought with him in his automobile from Memphis to Stuttgart in this State a quantity of the powder or dust, for the purpose of making the test, and he paid the aviator for his services in making it. Chapman had cooperated with state experimental stations in this State in working out projects for the development of uses for the products sold by the Chemical Co. That Company provided literature containing instructions for the use of 2-4-D to local distributors in this State, to be given to prospective users of the Chemical Co. products. It joined Arkansas local distributors in advertising Chemical Co. products in this State, and arranged for the advertisement thereof in a local paper, one half of the costs of which it paid and finally it brought a suit, now pending against the Elms Co. for the purchase price of the dust the distribution of which by plane gave rise to this law suit.

The case of Frene v. Louisville Cement Co., 77 U. S. App. D. C. 129, 134 F. 2d 511, 146 A. L. R. 926, deals at length and reviews many authorities on the concept of doing business by a foreign corporation. The opinion was written by Justice Rutledge then an Associate Justice of the U. S. Court of Appeals for the

District of Columbia, now a member of the Supreme Court of the United States. It was there said that the mere solicitation of business whether on a casual or occasional or regular, continuous and long continued basis does not constitute doing business in a foreign state, and it may be added that filling orders thus obtained by shipping goods in interstate commerce would not constitute doing business. But it was said in addition, "Consequently it is (not) clear that if, in addition to a regular course of solicitation, other business activities are carried on, such as maintaining a warehouse, making deliveries, etc., the corporation is 'present' for jurisdictional purposes. And very little more than 'mere solicitation' is required to bring about this result."

The facts herein recited constitute something more than the creation of good will or solicitation of business, and while it was shown that none of the Chapman products were stored for delivery in this State, it was shown that a portion thereof was actually brought into and delivered in this State by the company's authorized representatives, in fact, its President, himself, and this was done for the purpose of making the test which was made in this State which induced the sale of the very product, the use of which, for the purpose intended, resulted in the damage for the compensation of which this suit was brought.

This federal case, supra, is extensively annotated in 146 A. L. R. 926, where the leading cases are cited, a review of which would protract this opinion to an interminable length.

A more recent case on the subject of service on a foreign corporation is that of State v. Ford Motor Co., 38 S. E. 2d, 242, in which many authorities are reviewed and the conclusions announced conform to the views here expressed.

We conclude that the trial court did not err in holding that Act 347 of the Acts of 1947 applied in this case and in refusing to quash the service had under that Act.

The Chemical Co. insists however, that even though it was properly brought before the court by the service

had upon it, it was nevertheless error to join it in the suit against the Elms Co. inasmuch as it was not named as defendant by the plaintiff in that case, and no relief was prayed against it. It is insisted that our joint tortfeasor act does not authorize this action. As has been said this is Act 315 of 1941 and the controlling portions thereof read as follows:

"Before answering, a defendant seeking contribution in a tort action may move ex parte or, after answering, on notice to the plaintiff, for leave as a third-party plaintiff to serve a summons and complaint upon a person not a party to the action who is or may be liable as a joint tortfeasor to him or to the plaintiff for all or part of the plaintiff's claim against him."

The case of Baltimore Transit Co. v. State, 183 Md. 674, 39 Atl. 2d 858, annotated in 156 A. L. R. 460, cites numerous cases which have construed this or similar legislation. A headnote of that case reads as follows:

"A statute authorizing a defendant in a tort action to implead as a third-party defendant one alleged to be liable as a joint tortfeasor applies only where there is a common liability to an injured person in tort, and is inapplicable where the injured person has no right of action against the third party."

Here the injured parties, the original plaintiffs, do not concede that they have no cause of action against the third party defendant, the Chemical Co. On the contrary, it is asserted that the plaintiffs did have and now have a cause of action against the third party defendant. Plaintiff's contention is that they had a cause of action against the Elms Co. on which they were content to rely, and they did not elect to complicate that case by making the Chemical Co. a party. But it is said in cross appellant's brief, that now that the Chemical Co. has been made a party, although not on their motion, the judgment aganist the Chemical Co. should be affirmed. Indeed the position of the cross appellants, the original plaintiffs, is that not only should the judgment against the Chemical Co. be affirmed, but that the judgment against the Elms Co. should be reversed for the

reason that under the undisputed testimony its liability as well as that of the Chemical Co. was established. The Chemical Co. contends that it is not liable in any event and that the judgment against it should be reversed and the cause dismissed, or if not the judgment should be reversed because of certain erroneous instructions given over its objections and exceptions.

These contentions of the Elms Co. and of the Chemical Co. bring us to a consideration of the case on its merits, and we shall treat the two contentions together, as they are inseparably connected. The record upon the issues joined (consisting of exactly 1,000 pages) is so voluminous that we shall summarize it without detailing it.

It is undisputed that 2-4-D powder will answer the purpose for which it was designed, that is of killing plants with large leaves which appear in fields of rice. The most noxious of those weeds is the coffee bean plant which matures about the same time the rice does, and if allowed to mature its seed will mix with the rice when threshed and will destroy or greatly lessen the marketability of the rice, unless separated from the rice at great expense and trouble, usually by hand.

The chief objection to the use of the powder is that it is very dangerous to such plants as cotton, potatoes, vegetables, etc., when it comes in contact with them. This characteristic of the powder was well known, in fact the literature which the Chemical Co. published and circulated gave warning of that fact. The plaintiffs, or cross-appellants, insist therefore that both the Chemical Co. and the Elms Co. are liable to them for the damage to their cotton crop caused by the use of this powder. It is undisputed that the use of the powder caused the damage for which plaintiffs sued.

It was shown by testimony, which is undisputed, that the practice of dusting agricultural crops, as well as truck farms, etc., has prevailed for a number of years and is becoming a common practice. Some of these chemicals are dangerous to livestock and others to plants of certain kinds and they are used for various purposes.

Extensive and experienced planters who have used chemical dust for a number of years for different purposes, testified that when the areas to be treated are sufficiently large, aeroplanes are used in scattering the dust or chemical, and that if properly applied even by planes, the dust does not float or extend more than fifty or one hundred fifty feet beyond the area intended to be treated, and that no damage results beyond that distance to plants which would be damaged if touched by the dust.

The testimony developed the fact of which the Elms Co. was unaware and it was not shown that the Chemical Co. was aware, and that is that the 2-4-D dust possessed the quality of floating for great distances when cast in the air, even for miles. None of the experienced farmers who dusted their crops for various purposes had ever known any other dust, when properly applied, to float for a greater distance than from fifty to one hundred fifty feet. As has been said, cross appellants' cotton crop was three-fourths of a mile from the Elms Co. rice field at the nearest point.

The testimony shows that the Elms Co. used the dust on a morning when no wind was blowing and that it was distributed over the rice field by an aviator whose regular business it was to dust crops with the use of his plane, and who testified that but little of the dust was cast upon any land except the rice crop as he was careful to shut off the distribution of the dust when making the necessary turns of his plane.

The operator supervising the dusting process testified that he had been engaged in the crop dusting business for 22 years, operating from California to Florida and from Mexico to Canada and that when properly distributed the dust did not extend more than 40 to 50 feet beyond the area treated, but this testimony did not relate to 2-4-D.

The question of foreseeability of probable injury from the use of 2-4-D was submitted to the jury in instructions given at the request of cross appellants over the objections of both Elms Co. and the Chemical Co.

The jury might well have found, and evidently did find, that there was no previous experience in the use of agricultural chemicals which gave any indication of the danger of using 2-4-D to a crop three-fourths of a mile away, or that its use was "A cause from which a person of ordinary experience and sagacity could foresee the result that might probably ensue". Alaska Lumber Co. v. Spurlin, 183 Ark. 576, 37 S. W. 2d, 82.

The testimony shows that before buying or applying the 2-4-D chemical the manager of the Elms Co. consulted one L. C. Carter of Ark. Rice Growers Assn. regarding the use of 2-4-D. Carter had been and was a manager of the Rice Experimental Station near Stuttgart, 7 or 8 years, and was at that time manager of the Rice Growers Coop. Assn. and the Elms Co. manager was informed by Carter that he, Carter, thought its use would be all right. In other words, there is no evidence upon which to predicate liability against the Elms Co. except the fact alone that the Elms Co. did use a dangerous chemical, and we conclude that the verdict of the jury in favor of the Elms Co. was not unsupported by the testimony and should be affirmed.

As to the Chemical Co. a different test as to liability must be applied. The three chemical companies operated under a single officer, Chapman being the president of all three and the owner of practically all of the stock of all the corporations. The Illinois company did not manufacture the 2-4-D chemical dust, but its Memphis affiliate did. Appellant Chemical Co. was the distributor and sole agent for the Tennessee company in this State, and the testimony shows that it was selling an extremely hazardous product and was selling it as its own product. Indeed the testimony shows that the Tennessee Co. was in effect and in fact the agent of the Chemical Co. in manufacturing the dust, as all sales thereof here involved were made by the appellant Chemical Co. The testimony shows that the Chemical Co. was selling the dust as its own product. It controlled and distributed all advertising material which recommended its use and gave directions therefor. At § 400 of the Chapter on Torts, Restatement of the Law, it is said that one who

puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.

It is said there was no privity of contract between the Chemical Co. and cross appellants. This showing was at one time, and for some time considered necessary to occasion liability, the line of decisions to that effect going back to the early English case of Winterbottom v Wright, 10 Mees & W. 109, 152 Eng. Reprint 402, decided in 1842. But the courts have been getting away from that doctrine and many have entirely repudiated it and discarded it. The opinion of Justice Cardozo, then a member of the Court of Appeals of New York, and later an Associate Justice of the United States Supreme Court in the case of MacPherson v. Buick Motor Co., 217 N. Y. 382, 111 N. E. 1050, L. R. A. 1916F, 696, Ann. Cas. 1916C, 446, is credited with the inception of the modern doctrine of manufacturer's liability based upon foreseeability rather than privity of contract.

The Supreme Court of Mass. in the case of Carter v. Yardley, 64 N. E. 2d, 693, annotated in 164 A. L. R. 559, expressly repudiates the privity contract rule and stated that the MacPherson case, supra, was now generally accepted and the summary of the Mass. case and others there cited in that "The question in each case was whether the danger was sufficient to require the manufacturer to guard against it." In other words, that foreseeability and not privity was the proper test. See, also, § 824, Chapter on Sales, 46 Am. Jur. p. 946.

Now this 2-4-D powder is hightly efficient for its intended purposes, that is to kill broad leaved plants, but its very efficiency for that purpose makes its use extremely hazardous to other plant life.

An article appeared in the Ark. State Plant Board News in July, 1948, which began, "Effective June 24th the U. S. Civil Aeronautics Administration prohibits the use of 2-4-D dust by airplanes. This action was taken at the request of the U. S. Dept. of Agriculture following many complaints that drifting dust had injured cotton and other broad leaved crops."

This was subsequent to the spraying of the Elms rice crop which damaged appellant's cotton crop and in the law of negligence it is generally true that foresight and not retrospect is the standard of negligence. But here we are dealing with an extra hazardous chemical known to be highly dangerous.

The essence of this case is contained in instruction number 10-A given over the objection of the Chemical Co., which reads as follows:

"It was the duty of the defendant Chapman Chemical Company before putting an inherently dangerous product on the market to make tests to determine whether or not it would damage crops of others; if you believe from a preponderance of the evidence in this case that the 2-4-D dust applied on July 1, 1947, by the Elms Planting Company was an inherently dangerous product liable to damage the property of others, and that such tests were not made, then you are told that the defendant Chapman Chemical Company is negligent."

If this instruction is correct, the judgment against the Chemical Co. should be affirmed; if it is not, it should be reversed. Now a test was made but its purpose was to ascertain whether or not 2-4-D could be distributed by airplane as other dusts could be. It was found that it could be, but no test was made as to the floating quality of the dust, and it is this characteristic or quality of 2-4-D which makes its use extra hazardous. In other words, was the Chemical Co. under the duty of testing and knowing that 2-4-D dust, unlike other chemical dusts, would float for great distances. The undisputed testimony is that this 2-4-D, unlike other dusts, does not immediately or soon settle, but on the contrary floats in the air for long periods of time and for great distances, as much as 10, 15 or 20 miles, and one witness placed the distance at 35 miles.

That peril attended the use of the dust is undisputed. Indeed the literature circulated by the Chemical Co. contained this caution, "Chapman 2-4-D weed killer should be applied in such a manner as to avoid contacting crop plants such as cotton, sweet potatoes, vegetables, orna-

mental trees, etc." With this knowledge the Chemical Co. sold the dust, knowing that it would in its ordinary use be distributed from an aeroplane and it did this without making any test to determine what the effect thereof would be. Its literature referred to the dust as a proved weed killer and recommended the application of it by means of an airplane.

The undisputed testimony is that the Elms Co. bought the dust from the Chemical Co. and applied it in the manner directed for the known purpose for which it was sold and that this use thereof resulted in serious damage to cross-appellants. We think this testimony presents the question whether absolute or strict liability should apply.

In the case of Luthringer v. Moore, 31 Cal 2d, 489, 190 P. 2d, 1, it was said by the Supreme Court of California that, "It appears to be settled that the question whether the case is a proper one for imposing absolute or strict liability is one of law for the court." Among other authorities cited to support this statement is the restatement of the Law of Torts, § 520, Com. H.

If one casts into the air a substance which he knows may do damage to others, and in some circumstances will certainly do so, principles of elementary justice, as well as the best public policy require that he know how far the substance will carry or be conveyed through the air and what damage it will do in the path of its journey, and if he releases such a substance either from ignorance of, or in indifference to the damage that may be done, the rule of strict liability should be applied.

Such was the holding of the California case above cited. There a defendant engaged in pest eradication fumigated the basement of an office building above which there was a pharmacy. A preparation of hydrocyanic acid was used in the basement, which penetrated the floor and on the morning after its use an employee of the pharmacy was asphyxiated by the fumes of the acid. In holding the fumigator liable the opinion quoted the following statement from §§ 519, 523 of the Restatement of Torts: "One who carries on an ultra hazardous ac-

tivity is liable to another whose person, land, or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultra hazardous, although the utmost care is exercised to prevent the harm.—An activity is ultra hazardous if it (a) necessarily involves a risk of serious harm to the person, land, or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage.''

This opinion quoted from a prior opinion of the Supreme Court of California in the case of Green v. Gen. Pet. Corp., 205 Cal. 328, 270 P. 952, 60 A. L. R. 475, which collects other similar cases.

The opinion in the case of Spencer v. Madsen, 142 F. 2d, 820, deals with the question of liability of a manufacturer to a third party who had no contract relations with him. It was there said: ''Liability here is not predicated on the fact that the thing, when properly constructed, is inherently dangerous. Rather, it rests upon the principle that where the thing, when put to the uses for which it is intended by the manufacturer, by reason of defects which were known or could have been known by the exercise of reasonable care by the manufacturer, is dangerous to life and limb, the manufacturer is liable to third persons.''

We do not think the Chemical Company excused itself from liability by the mere showing that it was unaware of the peculiar carrying quality of the dust it was selling. Ordinary care required that it should know in view of the dangerous nature of the product it was selling, and it was charged with the knowledge which tests would have revealed. The case is therefore one in which the rule of strict liability should be applied.

Numerous instructions were asked, to the giving of which, or refusal to give, exceptions were saved. We do not review these for the reason that the instructions given fully covered every aspect of the case and conformed to the views herein expressed.

Justices Holt and McFaddin are of the opinion that the judgment for the Elms Co. should be reversed. Other members of the court are of the opinion that the judgment in favor of that Company should be affirmed. Justice George Rose Smith is of the opinion that Instruction No. 10-A above copied, which we said was of the essence of the case was erroneous and that the judgment against the Chemical Co. should be reversed for that reason. The result of these views is that the judgment for the Elms Co. should be affirmed and that the judgment against the Chemical Co. should also be affirmed. It is therefore so ordered.

George Rose Smith, J., dissenting in part. I agree that the standard of ordinary care is applicable in the case of the Elms Company, but I am unable to concur in the rule of absolute liability on the part of the Chemical Company. Instruction 10-A in effect told the jury that the latter company was negligent if it failed to discover by tests any possible harm that might result from the use of 2-4-D. Similarly, the majority hold that the manufacturer who puts a dangerous commodity on the market is responsible for the consequences of its use, no matter how unexpected or unforeseeable they may be.

I think the manufacturer's duty should be that of making such tests as are reasonably necessary in the circumstances—it being understood, of course, that the duty to take precautions increases proportionately with the degree of danger inherent in the commodity. It is shown that 2-4-D is harmless to narrow-leaved plants, but suppose for argument's sake that there is in the world one narrow-leaved plant that the dust will injure. Upon the majority's reasoning the Chemical Company would be liable for failing to test the dust on that particular plant, even though it may have made experiments with ten thousand other species. So as to the drifting quality of the chemical. The proof shows that many agricultural dusts have been widely used during a quarter of a century, yet none has ever before been known to drift more than a few rods. I think the jury should have the opportunity to decide whether the Chemical Company

acted with ordinary prudence in assuming that 2-4-D would float in the same way as other dusts.

The Restatement of Torts, cited by the majority, follows the rule of reasonable care in situations analogous to this one (§§ 388, 397, 400, 519). I find no reason for bringing into our law the principle of absolute liability. Experience elsewhere has shown that this doctrine is hard to confine, once its existence has been recognized. We shall be asked to extend the scope of this case in the future, and I can hardly see the point at which its application may logically be said to end.