ALDRIDGE *v.* MARCO CHEMICAL CO.

5-2679                                      356 S. W. 2d 615

Opinion delivered April 30, 1962

*Keith, Clegg & Eckert,* by *Oliver M. Clegg,* for appellant.

*Rose, Meek, House, Barron, Nash & Williamson,* by *J. W. Barron,* for appellee.

CARLETON HARRIS, Chief Justice.   The sole question in this litigation is whether appellee is amenable to service under the provisions of Section 27-340, Ark. Stats. (1947), or to state it differently, did the Columbia County Circuit Court acquire jurisdiction over Marco Chemical Company, a foreign corporation, by virtue of service obtained under the authority of that section.  Section 27-340 provides as follows:

"Any non-resident person, firm, partnership, general or limited, or any corporation not qualified under the Constitution, and laws of this State as to doing business herein, who shall do any business or perform any character of work or service in this State shall, by the doing of such business or the performing of such work, or services, be deemed to have appointed the Secretary of State, or his successor or successors in office, to be the true and lawful attorney or agent of such non-resident, upon whom process may be served in any action accrued or accruing from the doing of such business, or the perform-

ing of such work, or service, or as an incident thereto by any such non-resident, or his, its or their agent, servant or employee. Service of such process shall be made by serving a copy of the process on the said Secretary of State, and such service shall be sufficient service upon the said non-resident of the State of Arkansas, provided that notice of such service and a copy of the process are forthwith sent by registered mail by the plaintiff, or his attorney, to the defendant at his last known address, and the defendant's written return receipt, or the affidavit of the plaintiff, or his attorney, of compliance herewith are appended to the writ or process and entered in the office of the Clerk of the court wherein said cause is brought. * * *''

Appellants, engaged in poultry raising and egg producing, instituted suit against appellee, alleging, *inter alia*:

''That each of the undersigned obtained from Ark-La Feed and Fertilizer Company of Magnolia, Arkansas, by purchase or otherwise, during the period from January 30, 1958, to about June 1, 1958, poultry feed containing a substance manufactured and sold by the defendant to the said Ark-La, and known as Marcol B-75; that said Marcol B-75 was a vegetable oil fat sold and delivered by the defendant to the said Ark-La for the purpose of mixing the same with other ingredients into poultry feed; that the said Ark-La used, combined and incorporated Marcol B-75 in the same form in which it was received from and delivered by defendant with other ingredients in the manufacture of its poultry feed in the manner recommended by the defendant.

That upon consuming feed containing said Marcol B-75, sold and delivered by defendant to Ark-La on and after January 28, 1958, poultry belonging to plaintiffs became sick in large numbers; that said sickness was identified as 'Disease X' or 'Water Belly'; * * * that large numbers of poultry died, that large numbers were condemned as unfit for human consumption by the United States Department of Agriculture inspectors; that large numbers were otherwise affected so as to cause

great loss of weight and productivity as layers or breeders.

Plaintiffs are informed and believe, and upon such information and belief, allege that said Marcol B-75 contained a dangerous and deleterious substance or injurious element at the time it was sold and delivered by defendant, so that it was not fit to be combined with other ingredients in poultry feed, * * *.

* * * as a result of eating the feed above described, large numbers of poultry belonging to plaintiffs died and that such deaths resulted from poison contained in the feed delivered to these plaintiffs by Ark-La; that such feed was poisonous in that it contained foreign and deleterious substances which were in the fat furnished Ark-La by the defendant, Marco Chemical Company; * * *.''

Various counts of alleged negligence on the part of appellee were recited in the complaint, and appellants sought judgment in the amount of $9,950.63. Service was had upon the Secretary of State as agent for service of Marco Chemical Company, and appellee was notified as provided in Section 27-340. Thereafter, the Company filed its motion to quash the process issued, and to dismiss the complaint, for the reason that it was a foreign corporation, and had not been authorized to transact business intrastate in Arkansas, and had not designated an agent within the State upon whom process could be served.

"At no time material hereto, has it done any business or performed any character of work or services in the State of Arkansas, nor is it now doing so. * * *

The said Secretary of State is not now and never has been an agent of this defendant upon whom process may be served for it. This Court does not have jurisdiction over the person of this defendant and cannot obtain such jurisdiction by virtue of the purported service as aforesaid. * * *

Assumption by this Court of jurisdiction over the person of the defendant Marco Chemical Company by

virtue of the summons issued herein and the purported service thereof as alleged in paragraphs 2 and 3 hereof would be to deny said defendant due process of law in violation of the Fourteenth Amendment to the Constitution of the United States and would violate Article VIII, Sec. 3, of the Constitution of the United States, giving to the Congress of the United States the power to regulate the commerce among the several states.''

On hearing, the court held that the motion to quash should be sustained, and upon appellants' announcing that they elected to stand upon the service of process had, the court dismissed the complaint. From the judgment so entered, appellants bring this appeal.

According to a stipulation entered into between the parties, appellee, Marco Chemical Company, is a foreign corporation, organized and existing under the laws of the state of Texas. It has not qualified to transact business in Arkansas. The company is principally engaged in selling animal feeds and ingredients therefor, and does not now have, nor has it ever had or maintained in the state of Arkansas any office, warehouse, or place of business whatsoever. Nor has it ever maintained within this state any physical facilities or any stock or merchandise. The company has no bank account within this state, and no salesmen or representatives who reside in Arkansas. Dealings with Ark-La Feed & Fertilizer Company have been handled, according to the stipulation, in the following manner:

''Orders for its products from Ark-La Feed & Fertilizer Company were either sent by mail addressed to it at its office in Fort Worth, Texas, or were telephoned to it at its said office in Fort Worth. After the order was accepted the sales confirmation was mailed by defendant from Ft. Worth, Texas, to Ark-La Feed & Fertilizer Company in Magnolia, Arkansas. Prices on products other than B-75 were quoted on a basis of delivered Magnolia. The price of B-75 was FOB Fort Worth. Payment was accomplished either by the drawing and depositing of a draft in Ft. Worth, Texas, by appellee on Ark-La Feed & Fertilizer, or as an alternative, Ark-La

Feed & Fertilizer Company usually mailed to Marco at Ft. Worth, its check in payment of its account. Delivery was accomplished by appellee's own trucks and drivers, but the drivers did not make any collections for Marco, nor receive for appellee the purchase price for merchandise delivered, or any part thereof, nor did they have any authority to do so. All deliveries were made from Fort Worth, Texas, to Ark-La at Magnolia, Arkansas. * * *

(2)

It was customary for the driver of the appellee's truck to unload B-75 by means of a pump which was driven by the truck engine so that the product was pumped through a hose or pipes into the receiving tanks of Ark-La Feed & Fertilizer Company.

(3)

At all material times appellee has had business relations with customers in Fayetteville, Springdale, Fort Smith, Rogers, Little Rock, Blytheville, Chatfield, and Hughes, all in Arkansas, and all of which were handled and accomplished in the same manner as its dealing with Ark-La Feed & Fertilizer Company as set out above.

(4)

Appellee mailed from its office in Fort Worth, Texas, to Ark-La Feed & Fertilizer Company a copy of a drawing showing a proposed layout of pipes and tanks for receiving B-75.

(5)

Appellee solicited Ark-La Feed & Fertilizer Company to buy B-75 by mail, telephone, and in person, but no orders were taken by appellee at Magnolia, Arkansas. Appellee furnished Ark-La with literature designed to show the merits of B-75, which literature was published by institutions or representatives of institutions not connected with appellee. This solicitation was in 1956 because of the first delivery of B-75 to Ark-La Feed & Fertilizer Company was on January 28, 1957. Subse-

quent to January, 1957, a representative of appellee called upon Ark-La Feed & Fertilizer Company on several occasions in the interest of good will and good customer relations. No orders were taken on any of these visits."

Appellee vigorously contends that everything done was in interstate commerce; that its activities do not subject it to service of process as provided in Section 27-340, and, in support of the position taken, relies mainly upon our holding in *Rodgers* v. *Howard, Judge,* 215 Ark. 43, 219 S. W. 2d 240, the opinion being delivered on April 4, 1949. As a matter of background (which we deem essential to a proper understanding of the issue involved), it should first be pointed out that the United States Supreme Court in *International Shoe Company* v. *State of Washington, et al,* 326 U. S. 310, on December 3, 1945, held that a course of activity consisting merely of the solicitation of business, admittedly less than the "doing of business", subjected the acting foreign corporation to personal jurisdiction based upon constructive service. In 1947, the Arkansas General Assembly passed Act 347 (which includes the language of Section 27-340, heretofore mentioned). Dr. Robert A. Leflar, Distinguished Professor of Law, then Dean of the University of Arkansas School of Law, in an article appearing in 3 Arkansas Law Review, p. 18, wrote:

"The United States Supreme Court recently held that a course of activity consisting merely of the solicitation of business, which was admittedly less than the 'doing of business', in Washington enabled that state to subject the acting foreign corporation to personal jurisdiction based on constructive service. The Arkansas General Assembly may have been motivated by that decision in the enactment of Act 347 of 1947, providing that 'any non-resident person, firm, partnership . . . or any corporation not qualified . . . as to doing business herein, who shall do any business or perform any character of work or service in this State shall (be subject to constructive service) in any action . . . accruing from the doing of such business, or the perform-

ing of such work, or service. . . . .' The application of this statute was in question in a recent Federal case arising in Arkansas, and it was interpreted as not covering a cause of action arising out of a contract for an agent to solicit business in Arkansas, when the making of the agency contract and the solicitation thereunder were the corporation's only activities in Arkansas. This interpretation was on the express theory that the statute would be unconstitutional if interpreted to apply to the facts currently involved, since they did not amount to doing business' in the state. The Washington case was not cited. It is at least possible that a broader interpretation of Act 347, by the state courts, would not only be borne out by the wording of the Act but would, on the authority of the Washington case, be sustained as to its constitutionality by the United States Supreme Court.'' In April of 1949, the *Rodgers* case was decided. Rodgers contended that Campbell Soup Company was amenable to service of process under Act 347, and the Court, noting that the contention posed the difficult question as to the applicability of the rule announced in the *International Shoe Company* case, said:

"Assuming, but not deciding, that this evidence is properly before us, and that this is the appropriate method for presenting the issue, the transcript reflects that a traveling salesman of the Campbell Soup Company solicited orders from the Stuart Grocery Company in Nashville, Arkansas; that such orders were forwarded by the salesman to the home office of the Campbell Soup Company in New Jersey for acceptance or rejection; that sometimes the Stuart Grocery Company sent its orders direct by mail to the Campbell Soup Company in New Jersey; that upon acceptance of any order by the Campbell Company at its home office in New Jersey (whether the order was obtained by the salesman or sent direct by mail as aforesaid), the shipment from the Campbell Soup Company to the Stuart Grocery Company was packed, marked, and duly identified as for that party, and placed in a railroad carload shipment containing goods for distribution to other purchasers in the Nashville freight territory; that the entire carload moved by rail from

New Jersey to the Hunter Transfer Company at Texarkana, Arkansas; that this last-mentioned concern opened the car and then sent to the Stuart Grocery Company its shipment and likewise sent other purchasers their shipments from the said railroad car. In short, the Hunter Transfer Company broke the shipment to less-than-carload lots—all of which was evidently a freight saving device. Stuart Grocery Company paid direct to Campbell Soup Company in New Jersey.

Because of the activities of the Hunter Transfer Company in Texarkana, Arkansas, petitioner claims that the Campbell Soup Company was doing business in Arkansas, and therefore capable of being brought into the Arkansas courts by service of process on the Secretary of State under Act 347 of 1947, or service on the State Auditor under § 2250, Pope's Digest. The case of *Crawford* v. *Louisville Silo & Tank Co.,* 166 Ark. 88, 265 S. W. 355, and *Citizens Union National Bank* v. *Thweatt,* 166 Ark. 269, S. W. 955, are authority for our holding against petitioner's contention. In those cited cases, just as here, a non-domesticated foreign corporation accumulated several shipments into one carload shipment to an Arkansas point, where an agent of such corporation distributed the individual shipments to the various purchasers; and we held that such shipments were interstate commerce and did not constitute 'doing business' in Arkansas by the foreign corporation within the purview of our statutes.

\* \* \* Petitioner claims that Act 347 of 1947 changed the rules of law announced in the *Crawford-Louisville* and *Citizens Bank-Thweatt* cases, *supra,* and petitioner urges that the said Act allows the Campbell Company to be sued in a case such as this one, since (1) Hunter Transfer Company was the agent of the Campbell Company to break and subdivide the carload shipment, and (2) such act by the Hunter Transfer Company was done and performed in the State of Arkansas.

\* \* \* We pass this question as one of the unnecessary speculation. Whether the Legislature could validly enact such legislation is not for us to decide at this

time. We hold that Act 347 of 1947 was not intended to change the rule concerning the breaking of the journey of interstate shipments as announced in the cases of *Crawford* v. *Louisville Silo & Tank Co.* and *Citizens Bank* v. *Thweatt, supra.* Until such a change of the rule in these cases be attempted by the Legislature, we need not speculate on its constitutionality.''

Less than three months later, this Court, in *Chapman Chemical Co.* v. *Taylor, et al,* 215 Ark. 630, 222 S. W. 2d 820, held that service on appellant, a foreign corporation, under the provisions of Act 347, was valid. There, as here, the foreign corporation argued that it had done no business in this state sufficient to bring it within the provisions of the Act. The facts, as set forth in the opinion, showed that the company sought to introduce the use of 2-4-D in the rice growing area of the state, and to that end, its representatives came into the state and conferred with officers of the Rice Growers Association. A test was made in this state to demonstrate that 2-4-D dust could be distributed from an airplane. From the opinion:

''Chapman brought with him in his automobile from Memphis to Stuttgart in this State a quantiy of the powder or dust, for the purpose of making the test, and he paid the aviator for his services in making it. Chapman had cooperated with state experimental stations in this State in working out projects for the development of uses for the products sold by the Chemical Co. That Company provided literature containing instructions for the use of 2-4-D to local distributors in this State, to be given to prospective users of the Chemical Co. products. It joined Arkansas local distributors in advertising Chemical Co. products in this State, and arranged for the advertisement thereof in a local paper, one-half of the costs of which it paid and finally it brought a suit, now pending against the Elms Co. for the purchase price of the dust the distribution of which by plane gave rise to this law suit.

The case of *Frene* v. *Louisville Cement Co.,* 77 U. S. App. D. C. 129, 134 F. 2d 511, 146 A. L. R. 926, deals at length and reviews many authorities on the concept of

doing business by a foreign corporation. The opinion was written by Justice RUTLEDGE then an Associate Justice of the U. S. Court of Appeals for the District of Columbia, now a member of the Supreme Court of the United States. It was there said that the mere solicitation of business whether on a casual or occasional or regular, continuous and long continued basis does not constitute doing business in a foreign state, and it may be added that filling orders thus obtained by shipping goods in interstate commerce would not constitute doing business. But it was said in addition, 'Consequently it is (not) clear that if, in addition to a regular course of solicitation, other business activities are carried on, such as maintaining a warehouse, making deliveries, etc., the corporation is "present" for jurisdictional purposes. And very little more than "mere solicitation" is required to bring about this result.'

The facts herein recited constitute something more than the creation of good will or solicitation of business, and while it was shown that none of the Chapman products were stored for delivery in this State, *it was shown that a portion thereof was actually brought into and delivered in this State by the company's authorized representatives,*[1] in fact, its President, himself, and this was done for the purpose of making the test which was made in this State which induced the sale of the very product, the use of which, for the purpose intended, resulted in the damage for the compensation of which this suit was brought."

In the following year (1950), in *American Farmers Insurance Co. of Phoenix, Arizona* v. *Thomason, Guardian,* 217 Ark. 705, 234 S. W. 2d 37, in an opinion written by Dr. Leflar (who had, in the meantime, been named Associate Justice of the Court), this Court said:

"In *International Shoe Company* v. *Washington,* 326 U. S. 310, it was held that a course of activity consisting merely of the solicitation of business by salesmen, which was admittedly less than the 'doing of business', in Washington enabled that state to subject the foreign

---

[1] Emphasis supplied.

corporation to personal jurisdiction based on constructive service.''

A footnote at this point reads as follows:

''A statute providing for service in Arkansas on this theory was thereafter enacted, in Act 347 of 1947, Ark. Stats., § 27-340. See 3 Ark. L. Rev. 22-24. There are many cases, both in Arkansas and elsewhere, holding that a state may base jurisdiction upon the doing of the act (less than 'doing business') out of which arises the cause of action sued upon'' (citing cases).

This, then, is the history of Act 347, and the cases decided thereunder. In the final analysis, appellee depends upon the *Rodgers* case, and appellants rely upon the *Chapman* case.

Without hesitation or equivocation, we hold that the instant litigation is controlled by the *Chapman* case. Not only was the product delivered by the company's employees (as in the *Chapman* case), in a company truck, but this truck was especially equipped to make delivery of the product. The stipulation mentions the various activities engaged in by Marcol Chemical Company, and it is noted that deliveries have been made over the state at various times, in addition to several deliveries to Ark-La. In other words, this is not a case of a single, isolated delivery, but consistent sales and deliveries have been made. We think logic unquestionably supports the view taken. Why should a company be permitted to solicit business through personal appeal by its salesmen, sell its product, and make delivery of that product through use of the highways of this state, and to enjoy this privilege without the obligation of defending an action for alleged damages occurring to Arkansas residents because of negligence of the company?[2] This would leave appel-

---

[2] The stipulation also reflects that Marco duly registered its products for sale in this state with the State Plant Board as required by Act 108 of 1951; it also filed with the Board quarterly tonnage of its products shipped into the state. Appellants argue and cite authority that this is a further fact which would support their position that Marco Chemical Company was amenable to service in our courts. Since this fact is not considered controlling, we do not enter into a discussion of same.

lee corporation in the unusual, though enviable, position, of "having its cake and eating it, too." The legislature undoubtedly intended, in passing Act 347, to liberalize and extend the area in which foreign corporations could be required to answer in Arkansas for damages arising out of the conduct of their activities within this state. While we think the facts in this case are distinguishable from the facts in the *Rodgers* case,[3] we do not predicate, nor base this opinion, upon that premise. Actually, we are of the view that the *Chapman* case, in effect, over-ruled the *Rodgers* case, though it did not specifically so state. Therefore, as a matter of removing all doubt, we explicitly state that the *Rodgers* case can no longer be relied upon as authority for foreign corporations to evade the jurisdiction of our courts in factual situations similar to the one at bar.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

GEORGE ROSE SMITH, J., not participating.

---

[3] We think there is a vast difference, on the one hand, in *shipping* goods or products into the state, and having such products delivered by commercial carrier, and, on the other hand, in *delivering* the product through company representatives.