**Progar v. The Washington Hospital**

*Wray G. Zelt, 3rd,* for plaintiff.

*Francis H. Patrono,* for defendant.

SWEET, P. J., June 11, 1970.—This is an action of wrongful death and in survival. Sharon Ann Progar, who was admitted to The Washington Hospital on April 24, 1969, expired on May 1st of the same year. Malpractice and negligence by the hospital are charged. Plaintiff has also alleged that the hospital is absolutely liable in strict liability per se to him and claims not only the usual compensatory damages, but also punitive damages.

Defendant has taken preliminary objection to the claim of absolute liability and the demand for punitive damages. Without giving citation of cases, plaintiff has asserted that the conduct of defendant hospital brings it within the ambit of section 402(a) and section 519 of the Restatement of Torts. The claim of section 402(a) is based on the proposition that the hospital is the seller of drugs, that the drugs in question were in a defective condition unreasonably dangerous to the user; that the drugs reached the user without substantial change in condition; and that they caused the death of Mrs. Progar, the user. The argument that section 519 is controlling is based on the theory of ultrahazardous activities. Plaintiff's brief says this: "Certainly hospitals do commonly dispense drugs, however, they do not commonly dispense the major tranquilizers, such as were administered to the plaintiff's decedent, i.e., Mellaril, Stelazine, and Sparine. These drugs in no way are a matter of common usage and their inheritant (sic) dangerous qualities, appropriately bring them within the characterization of 'ultrahazardous.' "

This court held only 20 days ago that 402(a) is applicable to an action in wrongful death and survival. See Petrisek v. Joy Manufacturing Company and

Bethlehem Mines Corporation, November term 1969 no. 84, and much of what we said there could apply here if the challenge had been the same.

However, in our case today, the party defendant is The Washington Hospital, an eleemosynary corporation. Recently, the rule of charitable immunity which had long protected hospitals, churches, colleges and the like from the dangers and demands of personal injury litigation was abolished. Our Supreme Court in Flagiello v. Pennsylvania Hospital, 417 Pa. 486 (1965), squarely held that a hospital is subject to liability to a paying patient who suffers personal injuries as the result of the hospital's negligence. The five to two majority overruled Michael v. Hahnemann Medical College and Hospital of Philadelphia, 404 Pa. 424 (1961), and Knecht v. Saint Mary's Hospital, 392 Pa. 75 (1958), and I suppose, inferentially, a host of other cases as listed in the Chief Justice's impressive dissent.

Accepting Flagiello, supra, as we must, we come logically to the next inquiry: Shall we hold that an eleemosynary corporation is absolutely liable for the torts of its servants? Here, specifically, negligence in administering drugs is charged, although from the breadth and scope of the complaint, it is a little difficult to tell what else may be comprehended in the pleadings.

In the nature of things, a hospital will be constantly administering drugs, medications, analgesics, soporifics and the like. The most vital processes of the body will be the subject of examination, exploration and repair. Heart surgery, brain surgery, openings and closings of the peritoneum and other areas, will go on daily. Thousands of employe in the hospitals in Pennsylvania will participate in surgical procedures, as patients are placed under anesthetic, operated on, given intravenous injections, fed a variety of diets,

submitted to the modalities of treatment in physical medicine and the like. The opportunities for injury and death are incalculable. Surely, the hospital administrator must say with Lord Clive, "When I consider my opportunities, by God, sir, I stand astounded at my moderation!"

Flagiello, supra, standing alone, was a bitter dose for the charitable to swallow. To declare the hospitals absolutely liable in any or many of these situations hinted at above will be, if anything, worse.

Let us look at strict or absolute liability then as it has grown in England and here too, and see if we must reshape private medicine on this procrustean bed. Strict liability starts with Rylands v. Fletcher, L. R. 1 Exchequer 265, 3 H. L. 330, wherein it was held that an unnatural collection of water and its sudden release imported absolute liability. Because of the necessity of damming and milling in a pioneer economy, Rylands v. Fletcher, supra, received a cold reception in the United States.[1] The doctrine that the miller acts at his peril was only slowly accepted here. As Eldredge says in Modern Tort Problems, page 26, "The imposition of absolute liability would have crushed something the community needed very much."

The principle of absolute liability, however, has grown over the years and has been applied in a multiplicity of situations. We should look at a number of these and see if there is a thread running through them and, if so, whether we can trace its course in such a way as to advise us whether hospitals should be included. Blasting brought about absolute liability at an early day in Pennsylvania (see Mulchanock v.

---

[1] For discussion of whether we have Rylands v. Fletcher, supra, in Pennsylvania *as such*, see the voluminous small print, Pennsylvania Annotation to 519 of the Restatement and the many Sanderson cases.

The Whitehall Cement Manufacturing Company, 253 Pa. 262 (1916) ), and, of course, we here in Washington County are fully aware of Federoff v. Harrison Construction Co., 362 Pa. 181 (1949). An oil drilling situation not too greatly unlike dynamite blasting or dam breaking gave rise to liability in Green v. General Petroleum Co., 205 Cal. 328, 270 P. 952. The storage of explosives brought on absolute liability in Bradford Glycerin Company v. St. Mary's Woolen Manufacturing Co., 60 Ohio St. 560, 54 N. E. 528. These cases, blasting, oil drilling, storage of explosives, collected great masses of water, have something in common, and it is understandable why gradually similar results have been reached in them. The compelling similarity to a hospital situation is not so readily apparent.

However, absolute liability has come to be applied in a wider selection of cases than these few where the tremendous potential for harm and an analogy to trespass quare clausum fregit is pretty readily discernible. Absolute liability has been applied to a violation of the child labor laws in Faiola v. Calderone, 275 Pa. 303 (1923); to straying livestock, Erdman v. Gottschall, 9 Pa. Superior Ct. 295 (1899); and to the construction of coke ovens, Robb v. Carnegie Bros. & Co., 145 Pa. 324 (1891); all here in the Commonwealth of Pennsylvania. In an opinion of more than usual interest, the Georgia Supreme Court applied absolute liability to one who suffered his baboon to escape: Candler v. Smith, 50 Ga. App. 667, 179 S. E. 395. The spark arrester cases are legion in this field of the law. Railroads have been held absolutely liable for whatever fires defective locomotives set in the farmers' field exemplified by St. Louis and San Francisco Railway Company v. Matthews, 165 U.S. 1. Workmen's compensation laws have been sustained against the outcry that they imputed liability without

fault, e. g., New York Central Railroad Company v. White, 243 U. S. 188, 204 (1917). In a field far from personal injury, certain defamations have been found to give rise to such liability. One of the first of these was Morrison v. Ritchie, 39 Scottish L. R. 432 (1902), where a birth notice was printed attributing a newborn child to a couple married only three months. More conventionally, the practice of crop dusting has given rise to strict liability cases, for instance, Chapman Chemical Co. v. Taylor, 215 Ark. 630, 222 S. W. 2d 820 (1949). There is a tremendous advantage for plaintiff to pouring a situation into the mould of absolute liability because, "Where the rule of strict liability is followed, the contributing negligence of the plaintiff is not a bar to recovery": Harper and James, 1956, The Law of Torts, p. 843.

Notwithstanding the analogy of the spark arrester cases which have a background of appeasing agrarian dissent, courts have held that ". . . one who employs fires for steam in an extensive manufacturing enterprise is not liable for fires started by sparks escaping from the smokestacks of his factory"; e. g., O'Day v. Shouvlin, 104 Ohio St. 519, 136 N. E. 289 (1922). That case said:

"Because of the public benefits conferred by the erection and operation of these plants, as part of the system of our industrial civilization, private convenience must in some respects give way to public benefits. So long as these manufacturing plants are operated in the usual and ordinary way, by modern appliances and without negligence upon the part of the owner and operator, there will be no liability on the part of the latter, providing the operation is not inherently noxious or dangerous, and, therefore, a nuisance." See also Harper and James, 1956, The Law of Torts, p. 862.

The Supreme Court of Pennsylvania held in Sum-

mit Hotel Company v. National Broadcasting Company, 336 Pa. 182 (1939), that it wouldn't impose absolute liability on a broadcaster for an interpolated remark by a guest artist. This was the incident still remembered around here when Al Jolson said over the radio that the Summit Hotel, near Uniontown, was ". . . a rotten hotel . . . when I was in Uniontown the last time all the hotels were lousy." Eldredge, Modern Tort Problems, p. 56, gives an interesting account of this litigation.

The Restatement of Torts has entered this field and can contribute quite a lot to our understanding of the problem. For instance, it has supplied a definition of an ultrahazardous activity; section 520; "An activity is ultrahazardous if it (a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage." Section 521 provides that liability for an ultrahazardous activity ". . . does not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee or as a common carrier." It seems to me upon reflection that all of these cases of imposition of strict or absolute liability, except possibly the one about the escaping baboon, arise out of a balancing of social or community interests.

See for instance, comment (c) to section 402(a) of the Restatement 2d of Torts:

"On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable

sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products."

If this be the rationale for the liability of sellers of defective goods, as we are inclined to believe it is, it is plain that the eleemosynary corporation Washington Hospital is not covered.

Section 522 of the Restatement of Torts, comment (a), says this: "The reason for imposing absolute liability upon those who carry on ultrahazardous activities is that they have thereby *for their own purposes* created a risk which is not a usual incident of the ordinary life of the community." (Italics supplied.) An eleemosynary hospital is by definition not carried on for the actor's own purposes, but for the protection of life, the healing of wounds and the alleviation of pain. If, fortuitously, our eleemosynary corporation here were, say, a Catholic orphanage or a Presbyterian college, the reasoning would be the same. These things are done pro bono publico, and not for profit. Obviously, we do not consider today the operation of a hospital for profit nor pass any judgment on hospitals other than eleemosynary ones. It is noted that in section 523 of the Restatement of Torts, an exception from the rule of strict liability is granted where the person harmed by the unpreventable miscarriage of an ultrahazardous activity is ". . . a member of the public entitled to the services of a public utility carrying on the activity." It seems to me if an airline or electric utility is entitled to that exception, a hospital should be likewise. Even more plainly, section 521

gives exemption to strict liability if the activity is carried on in pursuance of a public duty imposed on the actor as a public officer or employe or as a common carrier.

Section 520 excludes from "ultrahazardous" activities, triggering absolute liability, those "of common usage." The comments of the annotators have made it plain that hospitalization is far too common to be included in the ultrahazardous.

The most recent opportunity our highest court has had to pass on this question is Haddon v. Lotito, 399 Pa. 521 (1960). Mr. Justice Eagen said there of the doctrine of absolute liability: "This doctrine has been applied in blasting operation cases and in other instances wherein harm was done by parties who so misused some private rights of their own as to have exposed the person or property of others to unreasonable risks of danger." Clearly, this definition is not satisfied by the instant case.

In summary then, we can see that the rule of strict liability is applied to cases where defendant has acted in his or its own interest, where the potential for harm is considerable, where the cost of verdicts can be distributed over those who benefit from the activity, and where the course of conduct involved should be confined to a relatively narrow ambit.[2] These characteristics can be well applied to the classes of cases arising from blasting, mill damming, oil drilling, the keeping of wild beasts, the storage of explosives, crop dusting and certain scurrilous defamations.

In the cases where the courts have declined to apply strict liability, for instance, transportation of per-

---

[2] There will have to be much blasting, for instance, and oil drilling and crop dusting, but in each specific instance, we don't want any more blasting or dusting than there has to be to accomplish the necessary task at hand.

sons by air,[3] it has apparently been felt that too great a deterrent would be placed on the activity in question. That, too, must be the theory behind the exception of public purposes mentioned in section 523, supra. It seems to us that to apply strict liability to the hospital, vulnerable as it must be, will have the following effects:

1. Substantially increase the cost of hospital care already skyrocketing.

2. Lessen the willingness of hospitals to permit imaginative, unorthodox or new procedures and medications.

3. Compel heavy-handed and inflexible safety regulations to prevent any risk to any person where, in the nature of things, action to save life and limb must often be speedy.[4]

4. Impose a burden of proof on an actor who has not caused the underlying situation.

This last requires some exegesis. In the blasting case, for instance, it is the blasting contractor who sets in motion the force that kills or injures plaintiff. In the hospital situation, characteristically, plaintiff will have something wrong with him requiring medicine or surgery before he goes. If the patient sickens and dies or the surgical procedures are unsuccessful, and that alone is enough to make the hospital liable,

---

[3] "For injury or loss of life to passengers, negligence in the condition or operation of the aircraft must be found": Harper and James, 1956, The Law of Torts, p. 846. It is the case of the passenger's injury or death, not the miscarriage of his baggage, which we refer to and consider analogous.

[4] There is a fascinating description of the split-second activity of an entire hospital galvanized into action by a suddenly arriving case of cardiac tamponade, fictionalized by Frank Slaughter in "Doctor's Wives." One cannot imagine this sudden mobilization of all the services of the hospital to save one life if safety procedures and conferences had been required.

we have accomplished an extraordinary broadening of defendant's duty.

It would be an extraordinary step only two years after Flagiello, supra, to move from a rule of complete immunity to a rule of complete liability. After Flagiello, one hesitates to say that such a broad policy decision should be left to the legislature. At least, it should not, and will not, be decided here.

The other half of this opinion need not detain us as long. Plaintiff has claimed punitive damages. Only a half page of his brief is devoted to this point and no cases are cited. This might almost be deemed a concession. Surely, one who wishes to work so severe a change in the established order of things owes the court some citation of authority here or elsewhere or, at the very least, some quotation from those who profess learning in the field or argument of social policy should be made.

We have already addressed ourselves in this court to the problem of the claim of punitive damages in an ordinary rear-end collision. See Avolia v. Hesslink, 49 Wash. Co. 11 (1968). We decline to allow the present plaintiff to try his case on such a theory. If an ordinary tort-plaintiff suing a hit-and-run driver cannot convert a conventional action into a vindictive one, a fortiori, one who in a representative capacity seeks damages from an eleemosynary corporation should not be given that beneficence. To open the door to the sort of evidence which a claim of punitive damages makes admissible, greatly enhances the likelihood of prejudice against defendant.

Section 908, Restatement of Torts, provides: "(1) 'Punitive damages' are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct." Comment (b) thereon says: "Punitive damages are awarded only for outrageous conduct, that is, for

acts done with a bad motive or with a reckless indifference to the interests of others."

Our Supreme Court has not been hospitable to claims for punitive damages. See Stewart v. Pittsburgh Railways Company, 379 Pa. 260 (1954); Zawacki v. Pennsylvania Railroad Company, 374 Pa. 89 (1953); Engle v. Reider, 366 Pa. 411 (1951); Fitsko v. Gaughenbaugh, 363 Pa. 132 (1949); Pedlow v. Lippens, 351 Pa. 259 (1945). Kasanovich v. George, 348 Pa. 199 (1943), is the leading case in the field and a careful review of its legal history shows the spawn of Kasanovich to have been puny and not longlived. As recently as 1963, the Supreme Court had an occasion to consider the matter of punitive damages in Chambers v. Montgomery, 411 Pa. 339 (1963). "In determining whether punitive damages should be awarded, the act itself together with all the circumstances including the motive of the wrongdoer and the relations between the parties should be considered." Here, the relation between the parties was that of patient and hospital. Need we say more?

Plaintiff's brief urges that consideration of this be deferred until the trial stage. We will repeat here what we said in Avolia, supra: "It seems wiser to me to confine the principle of Kasanovich v. George, supra, to the kind of situations which it has controlled in the past, or to other new emerging fact situations in which wanton misconduct is shockingly and appallingly apparent. If possible, it is best to sort these out at the preliminary objection stage so that when the parties go to trial they will know where they stand on contributory negligence and on the rules for damages. Not only rulings during the trial, but also the arguments of counsel, and even the

charge of the court in these cases will be greatly eased by a timely determination as to whether the case is to be tried as an ordinary negligence case or as a 'Reckless Disregard of Safety' case. . .

"One has a feeling that the fundamental theory of the Anglo-American tort law is to compensate victims and to place the expense of loss on the wrongdoer who causes it. Sometimes, for instance in the case of liability without fault, we must levy responsibility on a man who is not a wrongdoer, and sometimes, as in libel, to diminish breaches of the peace, we make exemplary damages available. But these are exceptions from the general rule or the mainstream of the law. The plaintiff has not convinced us we should create another such exception here."

Defendant's brief in a rather felicitous turn of phrase puts the matter well: "The fact that the complaint alleges no facts which support the adjectival exuberance of paragraph 11 suggests that there are none. At any rate, the complaint does not set up any factual basis for a cause of action for punitive damages."

Believing as we do that the proper trial of this matter will be facilitated by disposing of these issues now and at this stage, we accordingly make the following order:

## ORDER

And now, June 11, 1970, the preliminary objections of defendant are sustained and paragraphs 10 and 11 of the complaint in trespass are suppressed.