**Linda E. LUTZ, as parent and next friend of Catherine Lutz, a minor, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 81–3204.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1982.

Decided Sept. 2, 1982.

R. Keith Strong, Church, Harris, Johnson & Williams, Great Falls, Mont., for plaintiff-appellant.

Allen R. McKenzie, Asst. U. S. Atty., Butte, Mont., for defendant-appellee.

Before HUG, SKOPIL, and FLETCHER, Circuit Judges.

HUG, Circuit Judge:

Linda Lutz brought this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, on behalf of her daughter, Catherine. The child was severely injured by dog bites while residing in base housing at Malmstrom Air Force Base. Lutz claimed that the dog's owner was negligent in failing to control the animal, and that because the negligent acts occurred within the scope of the dog owner's Air Force employment, the United States was liable for Catherine's injuries. The district court concluded that because the dog owner was not acting within the scope of his employment, there could be no liability under the FTCA. We disagree with that conclusion and reverse the district court judgment.

I

The injury to Catherine Lutz occurred in August, 1978, when she was two years old. Catherine's father was an Air Force enlisted man, and the family resided in base housing at Malmstrom Air Force Base, near Great Falls, Montana. It was Air Force policy to encourage enlisted persons to live in base housing. Those choosing to live off-base had to obtain permission, and the housing allotment provided for enlisted persons was insufficient to cover off-base rentals. As a result, a very high occupancy rate was achieved at Malmstrom, with six to seven thousand persons residing in base housing.

The housing area in which the Lutz family lived consisted of small mobile homes surrounded by unfenced grass areas. The homes were situated very close to one another, and no barriers separated them. Residents were responsible for the upkeep of their yards. They were allowed to have pets, but were charged by Base Regulation 125–5 with control of any animals brought onto any part of the base. Section (d) of the regulation read in part:

(2) Control: The control of a pet is the owner's responsibility. When outside of the owner's quarters, pets will be kept on a leash or chain or under the direct voice control of a responsible person. Pets found wandering on base will be picked up by the Security Police whenever possible.

Colonel James Henry, the officer in charge of base housing and other support facilities at Malmstrom, testified that the base security police enforced this regulation, and that persons who failed to comply were subject to military discipline.

The mobile home adjoining the Lutzes' was occupied by Airman Harris and his family. Harris owned several dogs, including a wolf-malemute cross he named Satan. That dog was generally kept chained to the back of Harris's mobile home. On the day of the incident on which this case is based, Catherine and her sister were playing near their home. The dog entered the Lutzes' yard and attacked Catherine. She suffered multiple severe bite wounds on her face and shoulders. Despite corrective surgery, she is permanently scarred and may have sustained damage to sensory nerves. Further surgery will be required when Catherine is older. In addition, the district court found that she "suffered great pain during and after the attack and faces the prospect of

further psychological and psychiatric treatment."

Lutz brought this action against the United States, claiming that Airman Harris was acting within the scope of his employment when he negligently failed to control the dog, and that the United States was therefore liable. Damages were sought for Catherine's future medical expenses, including psychiatric care, and her pain and suffering.

After a bench trial, the district court awarded judgment to the United States, concluding that "[i]n keeping the animal which caused the tragic injuries to Catherine Lutz, Airman 1st Class Harris was not acting in the line of duty, but, rather, was acting for his own benefit." The court made no finding as to whether Harris had been negligent. It did find that, had liability existed, reasonable damages would include $5,000 for psychiatric treatment, $25,000 for past pain and suffering, and $10,000 for future pain, suffering, and emotional difficulties.

## II

■ The FTCA constitutes a waiver of the Government's immunity to suit only as to personal injuries caused by an "employee of the Government while acting within the scope of his office or employment . . . ." 28 U.S.C. § 1346(b). Where the employee is a member of the military, the scope of employment "means acting in line of duty." 28 U.S.C. § 2671. "Line of duty" is defined in turn by the applicable state law of *respondeat superior*. *Williams v. United States*, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955) (per curiam); *Dornan v. United States*, 460 F.2d 425, 427 (9th Cir. 1972).

■ We defer to the district court's interpretation of state law, here the Montana law of *respondeat superior*. *Allen v. Greyhound Lines, Inc.*, 656 F.2d 418, 421 (9th Cir. 1981). However, we are required to apply that interpretation to the historical facts to determine if the government employee acted within the scope of his employment. Where, as here, those facts are not in dispute, the determination of the scope of employment is a question of law, and thus freely reviewable by this court. *Dornan*, 460 F.2d at 429; *see also Craft v. United States*, 542 F.2d 1250, 1252 (5th Cir. 1976).

■ Accordingly, we adopt the view of the district court that under Montana law, an employee who acts entirely for his own benefit is generally held to be outside of the scope of his employment, and his employer is relieved of liability. *See Kornec v. Mike Horse Mining & Milling Co.*, 120 Mont. 1, 180 P.2d 252, 256 (1947); *Ellinghouse v. Ajax Live Stock Co.*, 51 Mont. 275, 152 P. 481, 485 (1915). We note, however, that the fact that the employee deviates from express instructions or acts "in utter disobedience thereof" generally does not relieve the employer of liability. *Keller v. Safeway Stores, Inc.*, 111 Mont. 28, 108 P.2d 605, 611 (1940). "The test of the [employer's] liability is not whether the [act] was committed in accordance with the master's instructions but whether the act complained of arose out of and was committed in prosecution of the task the servant was performing for his master." *Kornec*, 180 P.2d at 257.

The act to which the district court applied its interpretation of Montana law was the ownership of the dog. Because it found that ownership of a pet was a choice freely made by the base resident, and because that ownership was of no discernible benefit to the Air Force, the court concluded that Harris acted purely for his own benefit.

■ While we do not dispute these findings, we do not conclude this case turns on Harris's decision to own a dog. The claims of negligence go to Harris's acts or omissions in controlling the dog, and it is to those acts that the scope of employment analysis must be applied.

■ Colonel Henry, who is charged with the ultimate enforcement of Base Regulation 125–5, testified that the purpose of the regulation was to promote health and safety on the base, to ensure that the base functioned properly, and to assure that residents did not infringe their neighbors' rights. To achieve these goals, Regulation

125–5 is supported by a dual enforcement system. First, base security police patrol to pick up stray dogs. They also act on reports of stray dogs or dog bite incidents. However, the number of residents and pets limits the effectiveness of control by the security police. The base therefore relies primarily upon the second enforcement mechanism, control by the individual pet owner. The regulation requires that the owner exercise total control of the pet anywhere on the base. It thus delegates to the dog owner partial responsibility for this base security function. When the dog owner voluntarily brings a pet onto the base, he is assigned a mandatory, affirmative duty to protect the health and safety of all base residents by controlling the animal. If he fails to perform this assigned duty, he is subject to military discipline. This potential penalty underscores the importance of this duty to overall base security.

In *Williams v. United States*, 248 F.2d 492, 506 (9th Cir. 1957), we held that a soldier's act fell within the scope of his employment when he was "engaged in performing any duty or duties directly or indirectly associated with normal and regular army activities." We view base security as a regular military activity. Clearly, the employee to whom the security duty is delegated cannot be said to act entirely for his own benefit. Upon assignment of that duty, the employee who controls his dog acts in furtherance of his employer's interest in promoting order and safety on the base. We conclude that this security duty was delegated to Airman Harris, and thus controlling the dog was within the scope of his employment.

■ The district court expressed concern that imposing liability on the United States in this case would result in a rule of law holding "every city or town having a leash ordinance liable for every dog bite under its jurisdiction." We find this concern to be unfounded. Military housing presents a unique situation. Unlike employees and residents of cities and towns, the employment relationship of residents of military bases continues even during the off-duty,

at-home hours. We do not suggest that every act of a base resident is within the scope of his employment. Such a rule would impose upon the military a liability far broader than that of a private employer, contrary to the limited waiver intended by the FTCA. *See Chapin v. United States*, 258 F.2d 465, 468 (9th Cir. 1958), *cert. denied*, 359 U.S. 924, 79 S.Ct. 604, 3 L.Ed.2d 627 (1959). However, we agree with the Fifth Circuit that claims involving base residents require close examination of the employee's actions and the employer's interest in them. *See Craft v. United States*, 542 F.2d 1250 (5th Cir. 1976). The soldier in *Craft* injured a child in the adjoining yard while mowing his lawn. Although the soldier voluntarily chose to live on base, that choice resulted in the assignment to him of specific maintenance duties. Inadequate performance of those duties would result in military discipline. The court reasoned that in defining "scope of employment" in the military context as "acting in the line of duty," 28 U.S.C. § 2671, Congress mandated consideration of "the special factors characteristic of military activity and discipline." *Craft*, 542 F.2d at 1255, *quoting Hinson v. United States*, 257 F.2d 178, 181 (5th Cir. 1958). Imposing on base residents the duty of maintaining military property invoked such "special factors." Because the *Craft* soldier performed a specifically assigned duty enforced through the threat of military discipline, he acted within the scope of his employment. The instant case also raises special factors peculiar to the military employment situation. Based on those factors, we hold that Harris was delegated a specific military duty, the performance of which furthered the interests of the Air Force, and that he therefore acted in the line of duty and within the scope of his employment.

III

We next consider whether Harris's conduct comprised negligent or wrongful acts or omissions. 28 U.S.C. § 1346(b). Lutz contends that Base Regulation 125–5 imposes a duty on which liability may be based

and also states the standard of care. She argues that Harris's violation of the regulation constituted negligence per se or, at the least, evidence of negligence that the Government failed to controvert.

■ The United States is liable for Catherine's injuries only if a private person would be liable to her under the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). Even when the injury occurs on federal property, the finding of negligence must be based upon state law. *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Brock v. United States*, 601 F.2d 976, 979 (9th Cir. 1979). Thus any duty that the United States owed to Catherine cannot be founded on Base Regulation 125–5; its source must be Montana law. *Younger v. United States*, 662 F.2d 580, 582 (9th Cir. 1981); *United Scottish Insurance Co. v. United States*, 614 F.2d 188, 193–94 (9th Cir. 1979). The federal statute or regulation under which the employee acted only becomes pertinent when a state law duty is found to exist. The federal statute or regulation may then provide the standard for reasonable care in exercising the state law duty. *Id.* at 197 n.9.

■ The duty at issue here is the obligation of the dog owner to control his pet in a way that protects the health and safety of others. We conclude that Montana law imposes such a duty under Mont.Code Ann. § 27–1–715(1) (1981), which provides:

> The owner of any dog which shall without provocation bite any person while such person is on or in a public place or lawfully on or in a private place, including the property of the owner of such dog, located within an incorporated city or town shall be liable for such damages as may be suffered by the person bitten regardless of the former viciousness of such dog or the owner's knowledge of such viciousness.

Under this statute a private citizen comparably situated to Airman Harris could have a duty to control his pet. Montana law specifies that a duty exists only if there is a foreseeable risk of injury. *Schafer v. State*

*Department of Institutions*, 592 P.2d 493, 495 (Mont.1979). An injury such as Catherine suffered was reasonably foreseeable. Harris therefore had a state law duty enforceable under the FTCA.

■ The standard of reasonable care in performing that duty is specified in Base Regulation 125–5, which requires the owner to maintain total control of the animal at all times, either by confining it or through voice control. It is obvious on the undisputed facts that Harris failed to satisfy this standard. For whatever reason, Harris's dog was neither confined nor under voice control when it attacked Catherine. We therefore consider the effect of breach of this standard under Montana law. *See United Scottish Insurance Co.*, 614 F.2d at 197 n.9.

■ The violation of a Montana statute or ordinance enacted for the protection of the public is negligence per se. *Stepanek v. Kober Construction*, 625 P.2d 51, 55 (Mont.1981); *Azure v. City of Billings*, 596 P.2d 460, 464 (Mont.1979). "For this rule to apply, the plaintiff must be a member of the class in whose favor a duty was imposed by the statute . . .; and the defendant must be a member of the class against whom a duty is imposed." *Id.* (citations omitted); *see also Rauh v. Jensen*, 161 Mont. 443, 507 P.2d 520 (1973). In addition, the violation must be the proximate cause of the plaintiff's injuries. *Kudrna v. Comet Corporation*, 175 Mont. 29, 572 P.2d 183, 189 (1977); *Erickson v. Perrett*, 169 Mont. 167, 545 P.2d 1074, 1077 (1976). Where these three requirements are met, the defendant is negligent as a matter of law. *Azure*, 596 P.2d at 464; *Roberts v. Burlington Northern Railroad Co., Inc.*, 171 Mont. 143, 556 P.2d 1243, 1246 (1976).

■ However, Montana law distinguishes between violation of a statute or ordinance and violation of the standard specified in a regulation. Violations of administrative regulations are to be considered as evidence of negligence. *Stepanek*, 625 P.2d at 56 (applying regulation promulgated under federal Occupational

Health and Safety Act). It is therefore necessary to determine if Base Regulation 125–5 would be viewed by Montana courts as an ordinance or an administrative regulation.

Unlike statutes and ordinances, military regulations are not promulgated by representative bodies. In addition, enforcement of the regulations is based on penalties that are unique to the military. Despite these distinctions, we believe Base Regulation 125–5 most closely resembles a city or county ordinance intended to protect the health and safety of the general population. As we have noted, the size of the residential population at Malmstrom makes it substantially similar to a small town. Colonel Henry testified that as the officer in charge of base support facilities, his role was like that of a city manager. He stated he was responsible for law enforcement on the base, including enforcement of regulations such as 125–5 that are designed to promote the health and safety of base residents. The regulation thus is intended to promote the general welfare of residents, in the same manner as a municipal leash ordinance. Under Montana law, violation of this regulation would be equivalent to violation of an ordinance.

This violation satisfies the requirements for application of the Montana negligence per se rule. Catherine is a member of the class, residents of Malmstrom, which the regulation was designed to protect. Harris is a member of the class, owners of dogs, upon whom the duty of protection is imposed. The violation was the proximate cause of Catherine's injuries because it was a "direct and immediate cause without which the accident would not have occurred." *Sumner v. Amacher*, 150 Mont. 544, 437 P.2d 630, 634 (1968); *Sztaba v. Great Northern Railway Co.*, 147 Mont. 185, 411 P.2d 379, 385 (1966).[1]

The determination of negligence in an FTCA action is generally left to the trier of fact. *Smith v. United States*, 337 F.2d 237 (9th Cir. 1964). Proximate cause is also a question of fact in most instances. *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 770 (9th Cir. 1981); *Leaf v. United States*, 588 F.2d 733, 736 (9th Cir. 1978). However, where the facts are undisputed and only one conclusion may reasonably be drawn from them, both negligence and causation become questions of law. *Lies*, 641 F.2d at 770 (causation); *Leaf*, 588 F.2d at 736 (causation); *Flying Diamond Corporation v. Pennaluna & Co., Inc.*, 586 F.2d 707, 713 (9th Cir. 1978) (negligence). A thorough review of the district court record and of the transcript of this non-jury trial convinces us that the evidence presented by Lutz, and uncontroverted by the Government, admits of only one conclusion. We therefore hold that Harris's conduct comprised negligent acts or omissions done within the scope of his employment, and that the Government is liable for Catherine's injuries.

## IV

The district court made findings as to appropriate damages, consisting of $25,000 for Catherine's past pain and suffering, $10,000 for future pain and suffering and emotional difficulties and $5,000 for Catherine's future expenses for psychological

1. The Government suggested before the district court that negligence of Lutz, or negligence of Catherine herself, may have been contributory or intervening causes of Catherine's injury. Lutz contends these claims are not legally recognizable under Montana law. Assuming these contentions are based on viable legal theories, the Government did not provide adequate evidentiary support for either claim. It was established through Lutz's testimony that she had thrown a steak bone to the dog where it lay tied to Harris's mobile home shortly before the attack. This, in itself, was not an intervening cause of the attack, "without which the injury would not have occurred." Because Catherine was in her own yard, and Lutz reasonably assumed the dog was confined to its yard, injury to Catherine was not a foreseeable result of Lutz's decision to feed the dog.

The suggestion that Catherine contributed to her injury was not supported by admissible evidence. The report of the base police officer, admitted as a Government exhibit, included the opinion of an unidentified witness that Catherine "might have tried to take the bone" from the dog. This speculation is clearly insufficient to establish Catherine's liability.

treatment. There is no challenge to the $25,000 and $10,000 findings; however, Lutz challenges the adequacy of the $5,000 award.

At trial Lutz presented testimony from Dr. Edward Shubat, a clinical psychologist. He testified that Catherine was apt to suffer psychological problems beyond what might be anticipated to result from her injuries. This was based on his analysis of the marital and psychological problems of Catherine's parents, who Dr. Shubat concluded were incapable of providing the support necessary for Catherine's social and psychological development. The testimony was admitted over the Government's objection that the mental condition of the parents, who were not plaintiffs, could not form a basis for damages. The Government did not challenge Dr. Shubat's testimony that appropriate counseling would cost at least $45,000.

 In reducing this figure to $5,000, the district court did not state the basis for its award. Because we cannot determine from the record whether this finding is clearly wrong, we remand for the limited purpose of specification of the basis for this finding.

 The district court was not bound to accept the expert's opinion as to the amount of the damages, even though the witness was neither contradicted nor impeached. *Early v. United States*, 474 F.2d 756, 758 (9th Cir. 1973), *quoting County Asphalt, Inc. v. Lewis Welding & Engineering Corp.*, 444 F.2d 372, 378 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971). The reduction of the award to $5,000 may have been based on an evaluation of the witness's credibility. It may also have resulted from a comparison of Dr. Shubat's view of the Lutzes with the court's own observation of the family and the inferences drawn from Lutz's testimony. Under those circumstances, we would not conclude that the award was clearly wrong. *See Porterfield v. Burlington Northern, Inc.*, 534 F.2d 142, 146–47 (9th Cir. 1976) (allegedly inadequate damage award not to be overturned where it results from credibility judgments by trier of fact).

 However, the limitation of this award may have resulted from an erroneous view of the law. During colloquy with the Government's counsel, the trial judge stated that he "generally agreed" with the Government's contention that the psychological and emotional problems of Catherine's parents were not relevant to any damages she had suffered. Because of this view, the judge may have discounted Dr. Shubat's testimony that Catherine would require more extended counseling than might be required in the average case because her family situation would not contribute to her ability to cope with her disfigurement. Denying damages on this basis would be error.

 Under Montana law the plaintiff's family situation may be considered in determining appropriate damages. *See, e.g., Johnson v. United States*, 510 F.Supp. 1039, 1042–43 (D.Mont.1981) (applying Montana law, court considered family's ability to provide nursing care to plaintiff and effect of lack of nursing care on family members' emotional health and inter-family relationships). Contrary to the Government's contention, Catherine's unstable family situation is not a cause of her predicted emotional difficulties. The need for counseling resulted from her injury. The family situation is a pre-existing condition that Catherine brings to her effort to recover from the injury. It is thus an example of the general rule that the defendant must take the plaintiff as he finds her and accept liability for all consequences flowing from the injury. *See* W. Prosser, *The Law of Torts*, § 43 at 260–63 (4th ed. 1971). To reduce the damages by rejecting this evidence would be error.

We therefore remand to the district court for the limited purpose of reconsidering the award of damages for future psychological care, for specifying the basis for the award in a manner consistent with this opinion, and for entry of judgment for the plaintiff for the $35,000 found by the court and such additional amount for future psychological

care as may be determined on reconsideration.

REVERSED in part, REMANDED in part.