**Linda M. NELSON, individually and as parent and next friend of Tracey R. Nelson, a minor, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 85–0949.**

United States District Court,
District of Columbia.

April 29, 1986.

Norman L. Blumenfeld, Washington, D.C., for plaintiffs.

James N. Owens, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Linda M. Nelson brought this suit individually and on behalf of Tracey R. Nelson, her minor daughter, now twelve years old, seeking to recover damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, for injuries Tracey sustained as a result of a dog attack that occurred at Bolling Air Force Base on April 13, 1983. Based on the evidence adduced at a two-day bench trial, and for the reasons set forth below, the Court finds that plaintiffs are entitled to a judgment against defendant.

### I.

At the time of the incident in dispute, Tracey's father, Ricky O. Nelson, was enlisted in the Navy and was temporarily stationed in Japan. He was assigned residential living quarters on Bolling Air Force Base, in Washington, D.C., where his wife, Linda, and two children, Tracey, aged nine, and Philip, aged thirteen, resided. Housing on the base is maintained by the Air Force, and is subject to a variety of rules and regulations. *See* Bolling Air Force Base Housing Brochure, DX A. Among these is Air Force Regulation 163–4/Base Supplement 1 ("AFR 163–4"), which sets out a series of conditions governing the rights of residents to keep pets on the base.

On April 13, 1983, Tracey and a five-year old friend, Jessica, walked from the Nelson residence to a nearby playground, passing by the backyard of Air Force Sergeant Clyde B. Casey on their way. Sergeant Casey was stationed at the base and had been assigned living quarters there in 1971. Tr. 195. After playing for a short while, Tracey walked over to Sergeant Casey's house and stood by his backyard fence. Robert Casey, Sergeant Casey's eighteen-year old son, had just finished mowing the lawn and was trimming the yard with an electric weedeater. Tracey testified that she wished to ask him a question about a tennis ball her brother Philip had thrown into the Casey backyard several days before. As she approached the fence, which stood approximately four feet high, she saw the Casey's German shepherd, Rocky, circle around the yard and go into his doghouse. Although she testified that she did not see the Casey's two "Beware of Dog" signs, she was familiar with the dog, stating that it barked at everyone who walked by the yard. She did not call out to Robert Casey but waited until he saw her. While she was waiting, the dog crept up to the fence without attracting her attention, jumped up on its hind legs and bit her in the face. Tr. 123, 239.

Robert Casey did not notice Tracey until after the dog bit her, when he heard "a noise or a voice." Tr. 239. According to Tracey, Robert unplugged the weedeater, placed it in an outside closet and called the dog. At this point, the dog let go of her, turned, and followed Robert into the house. Robert then closed the back door and pulled the curtains shut. Tr. 157. Robert testified that he turned off the weedeater and ran to the house to tell his mother to

call the police and an ambulance, and that the dog followed him to the door. He denied pulling the curtains shut or taking the dog inside with him. Tr. 239–41. A neighbor of the Casey's first attended to Tracey, and she was brought home by the mother of her playmate, Jessica, after her friend had run for help. Linda Nelson called for an ambulance and Tracey was taken to Malcolm Grow Air Force Hospital at Andrews Air Force Base, where she was operated on. She sustained severe and extensive lacerations around her mouth and left eye and remained in the hospital for a week, suffering from general swelling of the face and what she and her mother described as "nerve pain." *Id.* at 56, 125.

Scar tissue subsequently formed around her upper and lower lips and left eye. Dr. Clyde Litton, a plastic surgeon who examined Tracey shortly after the attack, testified that she needed reparative surgery both for esthetic purposes and to improve the drainage in her left tear duct and the functioning of her lips. He further stated that Tracey has developed esotropia—that is, that she is cross-eyed—as a result of the injuries to her left eye, and that an opthamologist will have to perform surgery to repair the damage to her eye muscles. *Id.* at 38–42. Tracey testified that she must wear corrective glasses and suffers from double-vision and headaches. *Id.* at 125. Dr. Litton stated that in his opinion Tracey's injuries will require four reconstructive or reparative procedures; two other plastic surgeons who examined her believed three such procedures are necessary. *Id.* at 53–54. Plaintiff also introduced evidence of Tracey's pain and suffering in the weeks following the attack, *id.* at 27–29; and certain emotional problems and fears she has developed as a result of the incident itself and her disfigurement. PX 10–13.

Much of the testimony at trial concerned the dog's disposition and its alleged propensity to bite children, as well as whether Tracey had previously provoked or taunted the animal. A narrow fire lane ran between the Casey's residence and the adjacent dwelling, and was used by neighborhood children to reach a school bus stop and the playground where Tracey and her friend had been playing. Sergeant Casey's wife, Rosa, and Robert Casey testified that neighborhood children frequently taunted their dog, shouting and throwing rocks at it, and kicking the fence as they passed by. Tr. 253, 398–99. They claimed that Tracey was one of the chief offenders. *Id.* at 234. Tracey, on the other hand, denied teasing the dog. She stated that another girl in the neighborhood named Stacey, who looked just like her, taunted Rocky on a daily basis. Tr. 144–45. Another witness, Andrew Folts, confirmed that a girl named Stacey Lau bore a strong resemblance to Tracey, although he denied that Stacey teased the dog. *Id.* at 322–23. Folts and another witness, Ellen Kittle, described the dog as "vicious" and ill-tempered, and stated that it barked at passersby for no reason whatever. *Id.* at 318–22, 326–27, 346. A third witness, however, testified that the dog only growled at the children if they shouted at him. *Id.* at 393.

Plaintiffs also introduced evidence that the dog had previously bitten or scratched children. Base records indicate that Rocky bit eight-year old Brian Kittle on the nose on March 29, 1981, PXs 19, 20, and lacerated nine-year old Joseph Powell on August 27, 1981, PX 21. The reports characterized both attacks as provoked, although written comments to the reports fail to specify what form the provocation took, stating only that Powell was attacked while standing by the fence and that Kittle had wandered into Casey's yard. *Id.*[1] After each

1. Captain Reginald Louis Bond, Administrator of Bolling Clinic, testified that if a dog attacks anyone in the dog's yard, the attack is deemed to be "provoked," and, conversely, that an attack occurring outside the dog's yard is characterized as "unprovoked." Tr. 415. The Animal Bite Report concerning Joseph Powell's injuries orig-

inally designated the incident as "unprovoked," but this was subsequently changed to "provoked" even though the written comments indicate that Powell was not in the dog's yard. *See* PX 21. In addition, an Incident/Complaint Report prepared in connection with Brian Kittle's injuries states that the child was bitten while

incident the dog was ordered quarantined for ten days at the Casey's home. AFR 163–4 provides that where an animal bites a person, base security police must fill out incident reports and send a copy to the base commander or the owner. PX 56 at 1. If the first incident is "particularly vicious," or if a second incident occurs, the regulation requires the removal of the pet from the base at the end of a ten-day quarantine period. *Id.* at 2. Owners normally receive a letter of warning after the first incident. *Id.* The Caseys received no warnings after the Kittle and Powell incidents, nor were they required to remove Rocky after the second incident.[2]

## II.

Plaintiff advances two theories of liability: (1) that Sergeant Casey, acting within the scope of his employment, failed to exercise proper control over the dog; or (2) that the base commander negligently permitted a dangerous pet to remain in a residential area on the base, in violation of governing Air Force regulations. The Court addresses each of these contentions in turn.

The Federal Tort Claims Act waives the government's sovereign immunity with respect to injuries caused by an employee of the government acting within the scope of his office or employment. 28 U.S.C. § 1346(e). Where the employee is a member of the military, the scope of employment "means acting in the line of duty." 28 U.S.C. § 2671. "Line of duty" is in turn defined by the applicable state law of respondeat superior. *Williams v. United States*, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955). Under District of Columbia

law, which controls this case, an act is not within the scope of employment if done solely for the employee's purposes; rather, the tort complained of must occur at least in part as a result of a desire to serve the employer. *District of Columbia v. Davis*, 386 A.2d 1195, 1203 (D.C.App.1978).

■ Defendant contends that Sergeant Casey's decision to keep a German shepherd as a pet[3] was not within the scope of his employment, and therefore cannot serve as a predicate for liability under the Federal Tort Claims Act. A similar argument was advanced and rejected, however, in *Lutz v. United States*, 685 F.2d 1178 (9th Cir.1982). There, the Ninth Circuit reasoned that base regulations, which required pet owners to exercise control over their animals, essentially delegated partial responsibility for ensuring the health and safety of base residents to such owners. Military housing, the Court noted, is a unique situation in which the employment relationship of base residents continues even during off-duty, at-home hours. *Id.* at 1182. Base regulations, enforced through the threat of military discipline, impose certain duties on base residents which, while not common to civilian life, are characteristic of military activity and discipline. The performance of such duties, the Court concluded, is properly included within the scope of the resident's employment. Thus, just as in *Craft v. United States*, 542 F.2d 1250 (5th Cir.1976), where the Fifth Circuit held that a base resident who injured a child while mowing his lawn was acting within the scope of his employment, the *Lutz* court found that

---

attempting to pet the animal in the presence of Sergeant Casey and his son. PX 19 at 2. In short, the base reports' use of the word "provoked" appears to be incorrect or, at the very least, irrelevant for purposes of determining whether a given attack was excusable or not.

2. AFR 163–4 was issued on April 2, 1982, *after* the Kittle and Powell incidents took place. It superseded previous regulation 183–4, issued on February 3, 1981. *See* PX 56 at 1. It is not at all clear whether the later regulation drastically revised the earlier one or merely reflected minor changes in base policy.

3. The registered owners of Rocky were Sergeant Casey's son, Robert, and Robert's paternal grandmother, Virginia Casey, a resident of West Virginia. That Sergeant Casey was not the legal owner of the dog, however, is of no moment. He testified unequivocally that, as a member of the military, he was responsible for ensuring that all members of his household, which included his son, obeyed all base regulations, including those governing the keeping of pets. Tr. 197–98.

base regulations, which impose a duty on pet owners to control their pets, place that duty within the scope of the base resident's employment. *Id.*

In reaching that result, the Ninth Circuit applied Montana law, which follows the same substantive law of respondeat superior as the District of Columbia. Indeed, this jurisdiction generally favors a liberal application of the doctrine. *District of Columbia v. Davis,* 386 A.2d at 1203. In determining the scope of an actor's employment, the District of Columbia considers several factors of particular relevance to the present case. In *Davis,* for example, a case in which the District of Columbia was held liable for an off-duty policeman's negligent discharge of his weapon, the Court of Appeals found it significant that, at the time of the accident, the city had the right to direct and control the employee in the performance of his duties, notwithstanding his off-duty status; that the employee was aware of the fact that, for certain purposes at least, he was effectively on duty at all times; and that regulations requiring the employee to carry his weapon at all times were for the benefit of the public. *Id.* at 1203–05. So too here, defendant could and did direct and control Sergeant Casey's use of his base living quarters and his right to keep pets on those premises. Sergeant Casey was aware of defendant's authority in this regard. As a member of the military, Casey's off-duty hours, like those of the policeman in *Davis,* were subject to certain rules and regulations of his employer. And those regulations were designed to benefit other base residents such as plaintiff Tracey Nelson.

■ In sum, then, the Court finds that Sergeant Casey was within the scope of his employment at the time of Tracey's injury. His decision to keep a pet on his property was entirely for his own benefit, but having made that decision, base regulations imposed on him certain responsibilities, enforced through the threat of military discipline, which, if properly discharged, inured to the benefit of his employer. If he discharged those duties negligently, that neg-

ligence may properly be attributed to his employer.

■ In the District of Columbia, a dog owner is liable for any foreseeable harm inflicted by the animal if he knows or should know that the dog possesses some dangerous propensity. *Karlow v. Fitzgerald,* 288 F.2d 411, 412 (D.C.Cir.1961); *Wells v. Wynn,* 311 A.2d 829 (D.C.1973). While the Caseys portrayed their pet as gentle and docile, the evidence overwhelmingly supports the conclusion that they knew or should have known that it was capable of attacking and inflicting serious injury on people, particularly small children. The dog had attacked two children previously, biting one of them in the presence of Sergeant Casey and his son. Indeed, in the incident report describing the latter attack, Sergeant Casey stated that he warned the child that the dog would bite. PX 19. Neither incident was provoked—in one case, the child was simply attempting to pet the dog; in the other, the child was standing by the fence. A series of witnesses confirmed that the dog was ill-tempered and easily excited. The Caseys had ample reason to know of Rocky's propensity for viciousness and hostility, and the attack on Tracey was certainly foreseeable.

■ Nor did defendant carry its burden of establishing contributory negligence or provocation. Tracey testified credibly that she saw the dog enter its doghouse and that, her attention on Robert Casey, she never saw it approach the fence. She did nothing to provoke the animal; Robert Casey testified that he did not notice the child or hear her say anything until after the dog attacked her. While the Caseys stated that Tracey habitually taunted the dog, she denied this, and plaintiffs offered testimony, both Tracey's and that of Andrew Folts, indicating that the Caseys could easily have mistaken another girl in the neighborhood for Tracey. Moreover, it was certainly foreseeable that children on their way to a bus stop and playground would occasionally run past the Casey's fence or shout at the dog. Defendant failed to prove that Tracey in any way provoked the

dog on the day of the attack itself, or that she habitually harrassed it prior to the incident such that her conduct should excuse the attack.

The Court therefore concludes that Sergeant Casey knew or should have known of Rocky's dangerous propensities and, accordingly, that he is liable under District of Columbia law for the dog's attack on plaintiff Tracey Nelson for failure to exercise that caution, attention or skill a reasonable person would use under similar conditions. That negligence proximately caused the injury to Tracey and the resulting damages also to Linda Nelson, individually and as Tracey's mother and next friend. Because Sergeant Casey was acting within the scope of his employment at the time of the attack, his liability may be attributed to his employer, defendant United States Air Force.

■ Plaintiffs' second theory of liability is based on AFR 163–4, which requires base security police to keep records of dog bite incidents and to remove pets involved in two such incidents, or in certain cases, after one such incident if the attack is particularly aggravated. Plaintiffs argue that the regulation was designed to protect persons such as Tracey from precisely the harm that befell her, and point to defendant's failure to remove Rocky after he had bitten two children in 1981 as prima facie evidence of negligence. The difficulty with plaintiffs' reliance on AFR 163–4, however, is that the version of the regulation that plaintiffs cite was issued in 1982, *after* the two 1981 incidents. It is entirely possible that the 1982 version is in most material respects the same as the earlier regulation it replaced. The requirement that incident reports be filled out, for example, appears to pre-date the 1982 regulation, as such reports were prepared in connection with the Powell and Kittle incidents. Nevertheless, plaintiffs offered no evidence from which the Court can ascertain the criteria that governed the removal of pets from the base in 1981, and the Court declines to speculate on the matter. Similarly, the 1982 regulation cannot provide after the

fact evidence of the governing standard of care. In short, plaintiffs failed to demonstrate what regulations controlled the policing of pets in 1981, and cannot make out a violation of a 1982 regulation based on acts or omissions that took place in 1981.

■ This determination that plaintiffs failed to prove negligence *per se* based on a violation of governing regulations, however, does not end the matter. Plaintiffs demonstrated that defendant had plenary authority over the rights of base residents to keep pets on base premises. The record is clear that base superiors could and did regulate all facets of life on base property. Thus, regardless of whether base regulations in force in 1981 required the removal of dogs that had twice attacked children, there is no doubt that the security police *could* have ordered the removal of such a pet if they chose to do so. It is equally clear that base security police knew or should have known of Rocky's dangerous propensities, as they were in possession of two animal bite reports and one incident report indicating that the dog had attacked two children. Indeed, in the incident report, Sergeant Casey expressly stated that the dog would bite. Although the reports characterized the attacks as provoked, the police knew that this designation did not actually reflect the nature of the incident, but rather, whether the person involved was on the pet's property or not, *see* note 1, *supra*, and in fact, the written comments to the reports indicate that the attacks were unprovoked. The police had a responsibility to protect base residents from unreasonable dangers, had knowledge of Rocky's dangerous propensities as early as 1981, and had the authority to remove the animal from the base, which they eventually did following the attack on Tracey Nelson. Under these circumstances, the Court can see no reason to treat the base commander and his agents, the security police, any differently than a pet owner. The police, having knowledge of the danger posed by a dog on base property and the ability to eliminate or control that danger should be liable for any attacks made by the dog just

as any dog owner having similar knowledge and control would be. The Court concludes, therefore, that defendant, through its agents, breached a duty of care owed to plaintiffs by negligently permitting Sergeant Casey to keep a dangerous dog on base premises. Here, too, this breach of the duty of care proximately caused the injury and resulting damage to Tracey and to Linda Nelson, both individually and in her capacity as Tracey's mother and next friend.

### III.

Plaintiffs offered extensive evidence of Tracey's physical and emotional injuries and damages proximately resulting from the defendant's negligence, and the expenses incurred in the past and to be incurred in the future because of those injuries. While it is always difficult to determine that sum of money that will fairly and reasonably compensate the injured for all the damage suffered, in this case past expenses are certain and evidence of the reasonable probability of future losses, firmly supported by the testimony, is virtually unchallenged.

The plaintiff, Linda M. Nelson, parent of Tracey, will be entitled to recover those past medical expenses totaling $6,769.00, which she has a legal obligation to pay on behalf of her minor child. The elements constituting that total are: past medical expenses for physicians, dentists and hospitals—$5,668.00; for drugs and special clothing—$667.00; for meals and transportation—$178.00; and for her lost wages—$256.00.

The plastic surgeon testified credibly that the child's resulting "ugly-looking" scarring demands extensive scar revision and reconstructive surgery for the damaged regions around her eye and lips which, in addition to required esthetic improvement, would help alleviate, among other damage, the tear duct problem and also assist the functions of speaking and swallowing. While Tracey will have permanent physical scarring all her life, she will continue also to have significant emotional scarring as a result of the traumatization from the dog attack and each of the four surgical procedures recommended for the future. The evidence demonstrated, with reasonable probability, the need and the expense for this plastic surgery involvement which totals $30,800.00 for surgeons' and anesthesiologists' fees, the operating process and hospitalizations.

Additionally, the $1,500.00 requested for future prescriptions appears, according to the evidence, to be both probable and reasonable.

Tracey will need future surgical attention to the esotropia resulting from the injuries suffered in this cause. Currently she requires prismatic correction with glasses. The expenses for this during the next five to ten years are expected to amount to at least $8,000.00 according to unchallenged medical evidence (*see* PX 8).

It is unquestioned that as a proximate consequence of the canine attack, Tracey Nelson has suffered deep and continuing psychiatric scarring requiring intensive individual therapy to assist with her post-traumatic stress disorder, chronic. Psychiatric treatment, and psychoanalysis in particular, on a regular and continuing basis for three to six years (600 to 1,500 hours of psychiatric examination) is essential to help the child "deal with her neurotic problems and resultant internalization of anger, withdrawal, phobic concerns, depression, regression, etc." (PX 12; DX B, at 6). The child has had psychiatric evaluation at a health center near her home in Minnesota but has not commenced treatment due to the $95.00 per hour charge. Based on the reasonable probability of an average 1,000 hours of recommended therapy, the overall psychiatric expense would be $95,000.

■ Accordingly, and in summary of the above, the plaintiff, Linda M. Nelson, as parent and next friend of Tracey R. Nelson, a minor, is entitled to recover $135,-300.00 for future medical, surgical, pre-

scription and psychotherapeutic expenses found to be reasonably probable and appropriately attributable to acts of the defendant.

 It is undeniable that Tracey has incurred not only permanent scars, with resultant pain and suffering, but, in addition, has been burdened with emotional pain and suffering since Rocky's attack. She continues to suffer and the reasonable probability is that she will also have future pain and suffering. Based on the totality of the record, she is, therefore, entitled to be reasonably and justly compensated in the sum of $200,000.00 for this component of her damages.

> The nature of pain and suffering is such that no legal yardstick can be fashioned to measure accurately reasonable compensation for it. No one can measure another's pain and suffering; only the person suffering knows how much he is suffering, and even he could not accurately say what would be reasonable compensation for it. Earning power and dollars are interchangeable; suffering and dollars are not. Two persons apparently suffering the same pain from the same kind of injury might in fact be suffering respectively pains differing much in acuteness, depending on the nervous sensibility of the sufferer. Two persons suffering exactly the same pain would doubtless differ as to what reasonable compensation for that pain would be. This being true, it follows that jurors would probably differ widely as to what is reasonable compensation for another's pain and suffering, no matter how specific the court's instructions might be....

*Herb v. Hallowell*, 304 Pa. 128, 154 A. 582 (1931).

It is expected that Linda M. Nelson, as mother and next friend, will promptly advise the court of competent jurisdiction in the State of Minnesota of this judgment and seek its authorization for appropriate expenditures on behalf of Tracey R. Nelson, a minor.