**J. L. WILSON FARMS, INC. et al**
***v.*** Johnny WALLACE et al

CA 79-135                                590 S.W. 2d 42

Opinion delivered October 31, 1979
Rehearing denied December 5, 1979
Released for publication December 5, 1979

*Macom, Moorhead & Green,* by: *William M. Moorhead,* for appellants.

*Charles A. Walls, Jr.,* for appellees.

ERNIE E. WRIGHT, Chief Judge. This appeal to the Arkansas Supreme Court was assigned to the Court of Appeals pursuant to Rule 29(3).

Appellees, Johnny Wallace and Chester Mc Gee, filed action for damages against Appellants, J. L. Wilson Farms, Inc., Humphrey Flying Service, Inc. and Ned Brown, for damages to their respective 1974 cotton crops, allegedly caused by aerial spraying of a hormone type herbicide, 2-4-D, on the Wilson rice fields in the vicinity of appellees' cotton crops.

From a jury verdict and a judgment awarding damages in the aggregate amount of $36,717.20 in favor of Wallace and $980.35 in favor of Mc Gee, appellants bring this appeal and allege three points for reversal which are hereafter separately discussed.

## I.

Appellants contend the court erred in refusing appellants' motion to exclude from the jury the fact that the pilot of the plane, Ned Brown, who made the aerial application of the Herbicide to the Wilson rice fields in the vicinity of appellees' crops was not licensed to do so. Appellants contend the evidence had slight relevance, if any, and great prejudicial effect.

The court overruled appellants' motion to exclude testimony showing the Appellant, Ned Brown, was not licensed by the Arkansas Plant Board to make applications of the hormone herbicide by aircraft.

Act 152 of 1951 declared 2-4-D and any herbicide which the Plant Board, after investigation and public hearing, determines to be injurious to vegetation other than vegetation it was intended to affect, to be a public nuisance and prohibited the sale or use except in accordance with regulations as might be made by the State Plant Board. The regulation of the Plant Board issued pursuant to the Act was received in

evidence as joint exhibit #3. The regulation determines 2-4- D in certain conditions to be highly injurious to vegetation other than vegetation it is intended to affect, and it requires any commercial aerial applicator to first obtain authorization from the State Plant Board. It provides for the screening of such pilots based on their past history in the application or supervision of application of such herbicides. Appellees were permitted to prove the pilot, Appellant Ned Brown, had not complied with the regulation by obtaining the required Plant Board authorization. Evidence was also presented showing the aircraft belonging to the Appellant, Humphrey Flying Service, Inc., had not been inspected by the Plant Board to determine whether the spraying equipment of the plane met the requirements of the Plant Board regulation. Certificates are issued by the Board for aircraft and equipment approved for spray applications. The regulation details maintenance requirements incident to the spraying system and the requirement of notification to the Plant Board in writing of the name and address of the owner or owners of susceptible crops treated by the aircraft and the date of the treatment. The regulation further provides that unannounced spot check of equipment and application methods and jobs in progress will be made by the Plant Board; and that only pilots holding valid authorization from the Plant Board may apply hormone-type herbicides.

The regulation is extensive and detailed. The obvious intent is to prevent damage to others in the vicinity when a herbicide of this type is applied by aerial spraying. There was evidence aerial application of this herbicide results in floating of the substance for substantial distances with resultant damage to broad leaf crops. Injury to crops in the vicinity is partially dependent on weather conditions.

Neither J. L. Wilson, Inc., the owner of the rice fields being sprayed, the pilot who did the spraying, Ned Brown, nor Humphrey Flying Service, Inc., the owner of the aircraft involved, notified the Plant Board of the spraying. The plane and equipment were not approved by the Plant Board and the pilot, Mr. Brown, was not authorized to make aerial applications of the herbicide. Although Mr. Brown testified he was familiar with the requirements of the Plant Board and

that his plane and equipment were up to the standards required by the regulation, he was one of the defendants in the action and the court properly admitted evidence showing the appellants had not complied with the regulations of the State Plant Board calculated to safeguard the interests of others in the vicinity of the spraying. The appellees were not bound by the testimony of the Defendant Brown and the evidence of failure to comply with the Plant Board regulation was properly admitted for the jury's consideration along with all other evidence. We hold the regulation was a proper consideration for the jury in determining the issue of negligence. *Dunn* v. *Brimer,* 259 Ark. 855, 537 S.W. 2d 164.

## II.

Appellants contend there is no substantial evidence from which the jury could find that the herbicide, applied in a water base by aircraft, to a rice field over a mile from appellees' nearest cotton fields was an inherently dangerous product as defined by the court. The court told the jury that an "inherently dangerous product" is one, use of which for the intended purpose necessarily involves a risk of serious harm to the property of others regardless of the degree of care which is used in its preparation and use.

Nine of the jurors answered "yes" to the interrogatory submitted to them on the inherently dangerous product theory of the case.

There was substantial testimony in the record tending to show the application of this herbicide by air necessarily involves a risk of serious harm to broad leaf crops of others regardless of the degree of care which is exercised in its use, and the evidence was sufficient to support the jury finding that the product is inherently dangerous when used under the circumstances in evidence. *Chapman Chemical Company* v. *Taylor et al,* 215 Ark. 630, 222 S.W. 2d 820.

## III.

Appellants contend that it was only because appellees were permitted to use incompetent evidence that any material damage was shown.

The evidence of which appellants complain relates to the introduction by appellees of yields of cotton per acre for prior years on the lands for which crop damage is claimed for 1974, the averaging of yields of prior years, and showing the difference between the prior three and four years average yield and the 1974 yield. The difference was categorically stated as the crop loss for 1974. It is contended the evidence of injury to the 1974 cotton crop by comparison with prior years average yields was too speculative to submit the issue to the jury. This evidence was introduced by appellees without objection by appellants. However, appellants moved for a directed verdict at the close of the appellees' case and also at the close of the appellants' case, contending the evidence of production on the same fields for prior years had no validity bearing on the amount of yield loss for the year 1974 because, it was contended that there are great variations in year to year yields. Also, appellants contended there was considerable cold and wet weather in the summer of 1974 that reduced the yield. Appellants contend any damage to the crop in 1974 should have been shown by a comparison of yields for that year in undamaged cotton fields in the same vicinity with similar soil and farming methods.

However, evidence was offered on behalf of the Appellee, Mc Gee, of the reduced production on his thirteen acres of cotton as compared to his nearby undamaged cotton field.

Appellants contend the evidence was too speculative and conjectural to submit the issue of damages to the jury because of lack of substantial proof of damages, and that there was no proof of costs that would have been incurred incident to harvesting and marketing of the lost portion of the cotton crop, had it not been damaged.

We conclude from the evidence that the yield from cotton grown on the same lands in the area here involved is affected so much by weather conditions and other variables that the use of an average yield per acre for the preceding three or four years is not a reliable guide to the yield that would have been reasonably expected in the year 1974, absent injury from the herbicide. However, the testimony of Appellee Mc Gee whose cotton lands were near the Wallace

cotton fields and three-fourths mile from the Appellee Wilson rice fields reflected a per acre loss in yield of his cotton as compared to his nearby undamaged cotton in 1974 in the amount of 161 pounds per acre. We find this evidence to be the only substantial and reliable evidence upon which to predicate judgments in favor of appellees. Any judgment in excess of the amount warranted by this evidence would necessarily depend upon speculation and conjecture. It is to be noted the testimony of Appellee Mc Gee and appellants' witness, Bobby Frizzell, showed they sustained a large reduction in yield in their 1974 undamaged cotton fields, on lands similar to the Wallace and Mc Gee cotton lands, a fact which further demonstrates the speculative nature of attempting to determine crop injury by use of production figures for prior years.

Computing the loss of the Appellee Wallace for the 299.1 acres of cotton at a reduced yield, reasonably attributable to the spraying, of 161 pounds of cotton per acre would result in an aggregate yield loss in 1974 in the amount of 48,155.1 pounds. The evidence shows the cotton brought thirty-nine cents per pound and this would amount to a loss of $18,780.49. The seed on this amount of cotton at $20.00 per bale, as shown by the testimony, would have yielded an additional $1,926.20, giving a gross loss damage to the Wallace cotton in the amount of $20,706.69. This would be reduced by a payment in the amount of $289.21 Appellee Wallace received as a disaster payment from the ASCS Office for that year, leaving a net damage in the amount of $20,417.38 as the maximum net damage to Appellee Wallace supported by substantial evidence. It is true this makes no allowance for any reduction of damages by costs that might have been incurred in the harvesting and marketing of the portion of the crop lost by reason of damages. However, the evidence reflects Wallace and Mc Gee each had his own cotton picker and the testimony was there would have been no extra cost. It may well be that any extra cost would have been negligible since the machinery had to be operated over the lands to gather the reduced yield available for harvesting. The jury was properly instructed and we find no prejudice under this contention, *Moore* v. *Lawson*, 210 Ark. 553, 196 S.W. 2d 908 (1946).

The evidence of reduced yield on the 13 acres of herbicide damaged cotton belonging to Appellee McGee showed a reduction in yield as compared with other parts of his cotton crop on similar lands for the year 1974 in the amount of 161 pounds per acre and an aggregate loss of 2,093 pounds of cotton. He received thirty-eight cents per pound for his cotton and this shortage amounted to $795.00. His testimony showed the loss on seed for this amount of lint weight would be from $80.00 to $100.00. Appellee McGee also offered evidence of what his 1974 shortage would run using prior three years' production as a basis for determining loss. Using this method his loss was stated to be $988.00 plus $100.00 for seed loss. We hold the maximum loss to Appellee McGee supported by substantial evidence to be $895.00.

The judgments are reduced to the amounts herein stated in order to strip the judgments of amounts awarded upon speculative evidence calculated to determine the crop loss by using cotton production averages for prior years as a basis. The evidence was patently unreliable for establishing the loss in yield for 1974. The appellate court has authority to reduce the judgments to amounts supported by substantial evidence. *First National Bank of Minneapolis* v. *Malvern,* 171 Ark. 994, 287 S.W. 185 (1926).

We do not suggest the prior years' yields would be incompetent evidence for corroborative purposes. We merely hold that loss in production simply using the average of such yields as a basis for determining crop damage or injury does not constitute substantial evidence to support a verdict to the extent the verdict is supported only by such evidence.

The judgment in favor of Appellee Wallace is modified by reducing the aggregate judgment to $20,417.38; and the judgment in favor of Appellee McGee is modified by reducing same to $985.00.

As modified the judgments are affirmed, and the modified judgments are pro-rated among the three appellants on the same per centum basis as the original judgments.

NEWBERN, J., dissents, and PENIX, J., joins in the dissent.

DAVID NEWBERN, Judge, dissenting. The majority holds that evidence of prior year crop yields is not a sufficient basis to sustain a jury's damages determination. To the extent this court's decisions are precedents, I believe we are setting a bad one, and unnecessarily so.

The standard measure of damages for loss of part of a growing crop is the market value of the crop measured by the expected yield less the cost of maturing, harvesting and marketing the crop. Dobbs, *Remedies*, § 5.2, p. 325 (1973). In this case the majority deems deficient the evidence as to the "expected yield" part of this formula. Without citation of authority, the majority reduces this judgment because it finds evidence of prior year production speculative. But it finds evidence of a crop harvested by one of the plaintiffs in the same year to be a sufficient basis to sustain part of the jury's award.

Evidence of production from prior years was admissible and sufficient to sustain the verdicts and judgment. This case presents a classic example of well-represented plaintiffs stating "categorically" their losses and well-represented defendants presenting evidence that the plaintiffs should not recover as much as they think they should. The jury had before it evidence of the average crop yield of the Wallace operation as well as evidence of the yield of the untainted crops of McGee. Other evidence was presented with respect to weather conditions in 1974. The jury thus had before it a well-developed case on the issue of damages, and we should not disturb their fact determinations.

Early cases showing the acceptability of evidence of average yield per acre, along with other evidence, include *Lester* v. *Highland Boy Gold Min. Co.*, 27 Utah 470, 76 P. 341 (1904), and *Sayers* v. *Mo. Pac. Ry.*, 82 Kan. 123, 107 P. 641 (1910). More recent cases include, *Bryant* v. *McCann*, 297 So. 2d 262 (La. App. 1974), where the court notes how the trial judge itemized the damages to various of the plaintiff's crops caused by the defendant's cattle, and then says:

> In making those calculations, the trial judge determined the average yield which the plaintiff had obtained

in prior years for the same type of crops, raised in the same place and in the same manner. He then determined the market value of his 1972 crops, computed according to the method set out in the *Trahan* case, supra, [average yield less cost of marketing, harvesting and maturing the crop]. We think the trial judge was conservative in determining the average yield and market value of most of those crops.

We find no error in the method used by the trial judge in determining the loss sustained by the plaintiff. [297 So. 2d at 267.]

The Mississippi Supreme Court recently dealt with a 1974 cotton crop loss under circumstances remarkably similar to those of the case before us. In *Mid-Continent Aircraft Corp.* v. *Whitehead*, 357 So. 2d 122 (Miss. 1978), the plaintiff attempted to rely on federal government "projected yield" figures to show his crop injury. The court said it was error for the trial court to consider those figures, but then it very clearly relied on the average yields for the three years prior to 1974 as its basis for saying:

The history of actual production tends to negate substantial damage to the 1974 cotton crop traceable to the herbicide, but we conclude there was a case (though skimpy) sufficient to go to the jury. [357 So. 2d at 126]

The court's point was that the average yield of 633 pounds for the year 1971-1973 was not very different from the 1974 yield of 604 pounds.

In the case before us, the evidence showed the 1974 crop to be far below the average displayed to the jury and far below any one of the figures showing annual yield on each property farmed by Wallace. It is true there were variations from year to year in the prior year figures, but they could have been caused by any number of factors, like weather. That does not make those figures "speculative," especially where the jury has before it evidence of other factors, like weather, and the defendants have every opportunity to explain, as they did here, that the plaintiff's crop could have

been affected by factors other than their toxic spray.

Finally, I believe it would be instructive to look at the most recent crop damage case decided by the Arkansas Supreme Court and compare the evidence it approved as sufficient with that presented here. In *Sullivan* v. *Voyles*, 249 Ark. 948, 462 S.W. 2d 454 (1971), the court had before it the testimony of a farmer about loss to his "truck crop" due to the defendant's negligent spraying. He testified about the condition of the crop in the field and gave his opinion what its ultimate yield at the market would be. The court said that was sufficient, citing *Railway Co.* v. *Lyman,* 57 Ark. 512, 222 S.W. 170 (1893).

I cannot escape the conclusion the evidence here was far less speculative than that in the *Sullivan* case, and I believe it was no more speculative than the evidence the majority approves as sufficient to set Mr. Wallace's damages, i.e., evidence of the same year per-acre yield of a different farmer who may have different resources, skills and motives from those of Mr. Wallace.

I believe the evidence properly submitted to the jury in this case was sufficiently substantial to form the basis of its award to Mr. Wallace. Similarly, I do not see any reason to limit the jury to one factor with respect to Mr. Mc Gee's loss. Therefore, I would affirm.

Judge Penix has authorized me to say she joins in this dissent.