June D. PIPER, As Mother and Guardian of Matthew D. Durran, A Minor, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. LR-C-87-440.

United States District Court, E.D. Arkansas, W.D.

Aug. 25, 1988.

William F. Sherman, Jacoway, Sherman & Pence, Little Rock, Ark., for plaintiff.

Charles Banks, U.S. Atty., Little Rock, Ark. by Pat Harris, and A. Doug Chavis, Asst. U.S. Attys., and James A. Rowe, Major, USAF, Claims & Tort Litigation Staff, Office of the Judge Advocate Gen., HQ USAF/JACC, Bolling AFB, D.C., for defendant.

## ORDER

GEORGE HOWARD Jr., District Judge.

Trial was held before the Court on January 11th through 13th, 1988. The parties have subsequently submitted post-trial briefs and replies. After reviewing the evidence and these submissions in light of the applicable law, the Court now makes the following decision:

## FINDINGS OF FACT

1. On May 13, 1986, June Piper, as mother and guardian of then eleven year old Matthew Durran, filed an administrative action with the United States Air Force, pursuant to 28 U.S.C. § 2671, *et seq.*, alleging that the United States was liable for injuries sustained by Durran as a result of dog bites by a dog belonging to TSgt. Robert Williams on January 8, 1986. The claim was denied by the Air Force on April 29, 1987, and Piper, as mother and guardian of Durran, filed this lawsuit on July 1, 1987, pursuant to the Federal Tort Claims Act.

2. Piper was a National Guard enlisted person, assigned to the National Guard Professional Education Center and residing at 127 Oregon Avenue in base housing at the Little Rock Air Force Base (LRAFB). Durran was residing with his mother at that address.

3. Williams, who was a resident of the LRAFB at 129 Oregon Avenue, was an enlisted person in the Air Force assigned to the base. He was the owner of an Airedale dog named Arby.

4. On the afternoon of January 8, 1986, Durran returned from school on the bus and observed the dog in his backyard, sitting at the rear patio glass door and barking at their dogs inside the house. Durran called for the dog to follow him away from the back door and towards its own house when the dog knocked him to the ground and bit him on the forehead and around the scalp. The bus driver, who observed the dog on top of Durran, sounded her horn which caused the dog to depart, administered first aid and sent for an ambulance.

5. Durran was taken to the Air Base Hospital Emergency Room where the examination revealed an approximately 8cm curved laceration to the forehead just below the hairline along with two smaller lacerations in the crown area and two small puncture wounds in the scalp near the forehead. The lacerations were cleaned and a total of thirty-three (33) sutures were made. He was given antibiotics and returned for follow-up visits approximately eight times. The testimony and pictures reveal that Durran experienced swelling and bruising especially around his eyes.

6. Durran suffered considerable pain during the attack and afterwards through the treatment, swelling and the first follow-up visits. He experienced some dreams about dogs afterwards, although there is conflicting testimony as to whether Durran felt these dreams were important enough to inform his mother. He has also become very cautious of strange dogs although he continues to have a good relationship with dogs he knows.

7. Piper testified that Durran's grades took a plunge this past year and his attention span after the attack was less. However, she admitted that Durran has not only changed grades and schools this past year, but is living with his grandparents instead of her due to the uncertainty of her military status.

8. Durran was seen by Dr. Doug Stevens on December 17, 1987, at which time he was given tests and interviewed. Dr. Stevens also spoke briefly with Piper and Durran's grandfather. Dr. Stevens found Durran to have an adjustment disorder with mixed emotions of depression and anxiety and a post-traumatic stress disorder. He felt that twenty (20) to twenty-five (25) sessions would be needed at a cost of $85.00 to $115.00 a session for counseling.

9. Piper has not demonstrated emotional harm that will need psychological counseling as a result of the attack. Although Durran initially suffered bad dreams and has a fear of strange dogs, the evidence is simply not supportive of lasting emotional harm. The Court believes that it is significant that Durran was seen by a psychologist only less than a month before trial although Piper testified that his attention span had lessened after the attack. With the trial less than a month away, it is also clear that the focus of the parties seen by Dr. Stevens and Dr. Stevens' opinion would have been on the dog bite and its possible effects. Third, Durran's grades suffered this year when he changed grades, schools and moved in with his grandparents. The Court is convinced that

these events are more closely related to Durran's anxiety and depression during the 1987–88 schoolyear than the dog bite incident which occurred mid-way the 1985–86 schoolyear. The significance of Durran's living situation is clear as Dr. Stevens testified that counseling should be started when Durran was once again living with Piper so the living situation was stable.

■ 10. The evidence regarding the need for plastic surgery is mixed. Dr. Deane Baldwin, who examined Durran on March 28, 1986, found two significant scars which were healing satisfactorily, but were still immature. He found the one to the side and back of the head to be a small disfigurement since it had no hair growing from it and would be permanent although it would probably decrease in size. He found the scar on the forehead to follow the natural contour of the hair line which would improve in time to leave very little disfigurement except for a pencil line sized scar with a negligible amount of disfigurement. He stated that future correction of the scars would be at the discretion of a plastic surgeon and only the first scar would probably be given attention.

11. Dr. Robert Lehmberg examined Durran on December 3, 1986, at which time revision of the scars on his forehead was discussed. He estimated that the total cost would be approximately $3,800.00.

12. Dr. Shine Shong Lin had initially seen Durran on August 18, 1986, during one of his follow-up visits at the LRAFB. His notes reveal that he recommended observation for about one and one-half years until the scars matured, then for possible revision if needed. At trial, Dr. Lin examined Durran and found the scars to be mature. He would not recommend surgery as the scars were not bad now. He further testified that although the scar on the forehead could go up or down, it probably would go up as Durran grew older.

13. Based on the evidence from these doctors, the Court finds that it would be speculative to find that plastic surgery would be warranted for the scars. From the evidence and the Court's own observation, there is no doubt that Durran does have scars as a result of the dog bites. However, Dr. Baldwin thought that only the back scar would warrant attention while Dr. Lehmberg offered an estimate as to the approximate cost for revision of the scar on the forehead. It should be noted that Dr. Lehmberg's letter only discusses cost without his evaluation of the necessity of such a procedure. Dr. Lin, who was the only doctor to examine Durran after the scars had matured, opined that he would not recommend surgery. Even Piper testified that she had been told of medication, although the cost was not mentioned, that could help reduce the scar tissue without surgery.

14. Although Piper has failed to demonstrate that plastic surgery is warranted at this time or in the future for the minimal scarring, the fact remains that Durran does have scars, including the one on his forehead, for which he has changed his hair style and in which he sometimes catches his comb.

15. On the day of trial, Piper moved to amend the complaint to add herself as a plaintiff in order to recover past and future medical expenses. She had not previously filed an administrative claim in her own behalf although the claim referred to in Finding No. 1 did ask for the same sum sued for and did include Dr. Baldwin's report. The Court conditionally permitted the amendment to be filed although it was untimely and not in compliance with Local Rule 3(e). However, the Court directed the parties to address the appropriateness of the amendment in the post trial submissions.

16. Piper did not present any evidence of past medical expenses and failed to prove that future medical expenses will likely be incurred either during Durran's minority or after for psychological counseling, plastic surgery or any other medical treatment as a result of the dog bites.

17. Piper has failed to demonstrate any future pain, suffering, emotional harm or permanent disabilities for Durran as a result of the dog bites.

18. Durran is entitled to compensation in the amount of $8,000.00 for the pain, suffering and mental anguish he experienced during the attack by the dog, the medical treatments, and his recovery period with the swelling and bruises.

19. Durran is entitled to compensation for the scars and disfigurement in the amount of $1,600.00.

20. LRAFB has 1,535 residential units, which are operated within approximately 859 separate dwellings. The housing manager is responsible for the occupancy of these residential units and required to provide assistance to personnel with housing. The official policy is to rely on the private community assets as the primary means of housing with on-base housing acting as a supplement. It is a privilege to live on the base, not a right, and permission must be given to occupy base housing. Servicemen are on duty twenty-four hours per day.

21. Military regulations are part of the armed forces disciplinary system and disciplinary action can be taken administratively.

22. Dogs and certain other pets are allowed on the base with owners residing in the residential units, subject to control as provided under LRAFB Regulation 125–2, promulgated on May 20, 1981. This regulation provides that keeping animals on the base is a privilege and not a right; that animals may be kept so long as they do not become a nuisance to other base residents and are adequately controlled; that the owner must maintain control of the pet at all times and be totally responsible for its actions; that the owner must insure that the pet is not allowed to run free and uncontrolled; and that the responsibilities for enforcing the regulation lie with the base commander, the security police and the owner. The regulation further states that pets which have been reported to security police on two occasions as a nuisance, where the complaints have been found to be valid, will be removed from the base. Pets must be kept within fenced yards, leashed or chained to a stationary object without access to public roadways, driveways, parking areas or sidewalks and walked in certain specified areas least used by base personnel.

23. The purpose of this regulation is to ensure the safety of the people on base and security. The regulation assigns important responsibility to the owner since the owner has better and closer control of the animal. This regulation is a health and welfare regulation rather than a disciplinary regulation and so it is considered lower on the scale of priority. While administrative action would be taken for each violation of the regulation and an infraction would be relevant to a promotion, the reality of the effect would be the severity of the offense such as forgetting to buckle the seat belt when compared to theft.

24. On January 11, 1985, Williams was cited in an incident report for failure to control his pet, Arby, when the dog was found running at large and taken to the kennel. The resulting administrative action taken was Williams being verbally counseled by the commanding officer on Williams' responsibility to maintain adequate control of pets in base housing.

25. On January 26, 1985, LeChelle Stimson, who was three years old, was visiting the Williams' home with her parents. While the adults were in the living room and the children were in the kitchen, Arby bit LeChelle through the nose. LeChelle was taken to the base hospital which notified security. LeChelle's father told the investigator that she had pulled on the dog's whiskers and so it had bitten her. Her father testified at trial that although he had not seen the incident, he had based his statement on LeChelle's rough play with her toys. Based on the statement by the father, the bite was reported as provoked and so not considered a nuisance. However, Williams was once again verbally counseled on his responsibility to maintain control of pets in housing. The stipulation of the parties as to LeChelle's testimony of the incident reveals inconsistencies regarding who she told and her perception of time.

26. Even though LeChelle's statement given three years after the bite indicated that Arby bit her after she told him to stop

licking her face, the Court does not find the security police to have been negligent in investigating LeChelle's bite. The father of the then three year old related she had pulled Arby's whiskers. There was absolutely no reason for the investigators to doubt the father's statement and so they reported the incident as provoked.

27. On March 30, 1985, Arby bit one of Williams' own sons at their house. This was reported by Williams to the base veterinarian who recorded it in the log book as part of the accountability system for rabies control. A report was not made to the security police since it was Williams' own son and so was not considered to be a dog bite incident against the public. The first report of this incident outside of the veterinarian's records was contained in the veterinarian's recommendation dated January 9, 1986, that Arby be removed from the base as the dog was a nuisance to the health of the base population with biting three children in twelve months. The base commander then ordered Williams to remove Arby from the base.

28. The base commander and the security police acting promptly and correctly gathered the necessary information from all sources so that Williams was ordered to remove Arby from the base within one day after Durran was bitten.

29. Although there was conflicting evidence, the Court finds that Arby did not habitually run about the neighborhood in an unattended mode. Except for the fact that three children were bitten in three separate incidents, there was no evidence presented that Arby had exhibited any aggressive or vicious tendencies.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter.

2. The Federal Tort Claims Act constitutes a waiver of the government's immunity to suit only as to personal injuries caused by an "employee of the Government while acting within the scope of his office or employment...." 28 U.S.C. § 1346(b). Where the employee is a member of the military, the scope of employment "means acting in line of duty." 28 U.S.C. § 2671. The law of the forum state, here Arkansas, defines "line of duty."

3. Under Arkansas law of respondeat superior, an employee is acting within the scope of his employment or "line of duty" when he is acting in furtherance of his employer's interest or for the benefit of the employer. *Williams v. Natkin & Co.*, 508 F.Supp. 1017 (E.D.Ark.1981); *Orkin Exterminating v. Wheeling Pipeline*, 263 Ark. 711, 567 S.W.2d 117 (1978).

4. Williams, as the owner of Arby, had the important responsibility and duty to control his pet for the safety of the people on base and security. This duty on him as an enlisted person in the Air Force and as a resident of the base was created and enforced by LRAFB Regulation 125–2. The failure to perform this duty would subject the violator to military discipline.

5. The analysis by the Ninth Circuit Court of Appeals in *Lutz v. U.S.*, 685 F.2d 1178 (9th Cir.1982) is applicable to the facts developed here. Under LRAFB Regulation 125–2, Williams was delegated a security duty which promoted the government's interest in health, safety and security on the base and so the control of a pet's acts was in furtherance of the government's interest. Thus, the control of Arby in accordance with the regulation was within the scope of Williams' employment. *See also, Craft v. U.S.*, 542 F.2d 1250 (5th Cir.1976); but compare, *Nelson v. U.S.*, 838 F.2d 1280 (D.C.Cir.1988).

6. The difference in policy between the base in *Lutz* and the LRAFB regarding on-base housing and allotments does not change the reasoning that residents of base housing, whether there by choice or requirement, are assigned a responsibility to control their pets since they are closer to the situation and they relieve the security police from having the sole duty of control in order to perform other security duties.

7. As Williams was acting in the line of duty with the delegation of pet control, the Court must now decide whether his conduct constituted negligent acts or omissions.

8. LRAFB Regulation 125–2 provided a standard of reasonable care for the duty of protecting the health and safety of base people from his pet by imposing upon him broad responsibilities to control his dog at all times by confinement or noose.

9. Arkansas law, which must be applied in determining negligence, provides that a violation of a regulation is evidence of negligence to be considered with other facts and circumstances. *Dunn v. Brimer,* 259 Ark. 855, 537 S.W.2d 164 (1976). *See also, C.J. Horner, Inc. v. Moore,* 268 Ark. 1019, 597 S.W.2d 857 (App.1980); *J.L. Wilson Farms, Inc. v. Wallace,* 267 Ark. 643, 590 S.W.2d 42 (App.1979).

10. From the factual findings it is clear that Williams violated LRAFB Regulation 125–2 on January 8, 1986, by failing to control his dog who was free to be on the next door neighbor's patio and attack Durran. Just a year earlier, Williams had also violated this regulation and received the administrative discipline of a verbal counseling when Arby was found running free.

11. Williams' conduct constituted negligent acts or omissions and since his conduct was within the scope of his employment or line of duty, the United States is liable for Durran's injuries.

12. Piper was conditionally permitted to amend her complaint to include her claims for future medical treatments to be expended on Durran during his minority in light of *Parrott v. Mallett,* 262 Ark. 525, 558 S.W.2d 152 (1977). While the Court believes it is a very close legal question as to whether the May 13, 1986, claim falls into the *Executive Jet Aviation [Inc., v. United States,* 507 F.2d 508 (6th Cir.1974)] exception discussed in *Manko v. U.S.,* 830 F.2d 831 (8th Cir.1987), based on the facts presented and the above findings of the Court, Piper is simply not entitled to compensation for future medical expenses in either her own behalf or Durran's behalf.

13. The United States is liable to Piper in the amount of $8,000.00 for the pain, suffering and mental anguish Durran experienced during the attack by the dog, the medical treatments, and his recovery period. The United States is also liable to Piper in the amount of $1,600.00 for Durran's scars and disfigurement. The United States is not liable to Piper for any future medical expenses to be incurred by either Piper during Durran's minority or for Durran after he has reached the age of majority, for any future pain, suffering, emotional harm or permanent disabilities as a result of the dog bite since these elements were not proven.

Accordingly, judgment will be entered in favor of Piper as mother and guardian Durran and against the United States in the total amount of $9,600.00.